NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13248

COMMONWEALTH  vs.  DAVID PRIVETTE.


Suffolk.     September 9, 2022. - March 28, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Firearms.  Practice, Criminal, Motion to suppress, Interlocutory
     appeal.  Evidence, State of police knowledge.
     Constitutional Law, Search and seizure, Reasonable
     suspicion, Investigatory stop.  Search and Seizure,
     Reasonable suspicion, Threshold police inquiry.  Threshold
     Police Inquiry.



     Indictments found and returned in the Superior Court
Department on October 10, 2018.

     A pretrial motion to suppress evidence was heard by Elaine
M. Buckley, J.

     An application for leave to prosecute an interlocutory
appeal was allowed by Lenk, J., in the Supreme Judicial Court
for the county of Suffolk, and the appeal was reported by her to
the Appeals Court.  After review by the Appeals Court, the
Supreme Judicial Court granted leave to obtain further appellate
review.


     Anne Rousseve, Committee for Public Counsel Services, for
the defendant.
     Kathryn Sherman, Assistant District Attorney, for the
Commonwealth.

GAZIANO, J.  On a rainy, early morning in August of 2018, Boston police officers received a report of an armed robbery of a gasoline station in the Clam Point area of the Dorchester section of Boston at 3:35 A.M.  The first radio report described the suspect as a "Black male, late twenties, five foot seven, blue hoodie, blue jeans, on foot towards [a pharmacy]."  Later dispatches added that the suspect had facial hair.  Seven minutes after the first dispatch, and one street away from the location of the armed robbery, an officer stopped the defendant.  Contemporaneously, other officers responding to the call were canvassing the area for potential suspects; one of the officers continued to communicate via the police department radio channel dedicated to use in the area.  This officer arrived at the location of the investigatory stop at the same time as the officer who initiated the stop.  After a patfrisk of the defendant's person and his backpack by both officers revealed $432 and a firearm, the defendant was arrested and indicted for multiple firearms offenses.  He filed a motion to suppress the items seized as a result of the stop, on the ground that the officer who initiated it lacked the requisite reasonable suspicion.  After an evidentiary hearing, a Superior Court judge denied the motion, and the defendant sought interlocutory review.  The single justice allowed the appeal to proceed in the

Appeals Court, where the court affirmed the denial of the motion to suppress.  We then allowed the defendant's application for further appellate review.

We are tasked with deciding whether, through the collective knowledge doctrine, information known to other investigating officers may be imputed to the officer who initiated the stop, and thus be included in the calculus of reasonable suspicion without violating art. 14 of the Massachusetts Declaration of Rights.  To date, we have permitted the aggregation of information known to one police officer to other officers for consideration in the calculus of reasonable suspicion or probable cause, even without evidence of communication among the officers, so long as they were engaged in a cooperative effort. See, e.g., Commonwealth v. Mendez, 476 Mass. 512, 519 n.8 (2017) (trooper's knowledge that defendant was suspect in shooting was imputed to other arresting officer, even absent evidence of direct communication between officers), citing Commonwealth v. Quinn, 68 Mass. App. Ct. 476, 480-481 (2007), quoting Commonwealth v. Riggins, 366 Mass. 81, 88 (1974) ("Where a cooperative effort is involved, facts within the knowledge of one police officer have been relied on to justify the conduct of another"); Commonwealth v. Montoya, 464 Mass. 566, 576 (2013) (imputing one officer's knowledge that individual just purchased drugs to acting officer absent communication); Commonwealth v.

Roland R., 448 Mass. 278, 285 (2007) ("the knowledge of each officer is treated as the common knowledge of all officers" [citation omitted]).

We conclude that, with respect to the horizontal collective knowledge doctrine, art. 14 requires more. To be consistent with the requirements of art. 14, in order to aggregate officers' knowledge, the officers must be involved in a joint investigation, pursuing a mutual purpose and objective, and they must be in close and continuous communication with each other about that shared objective. While the officer who actually effectuates the stop need not have personal knowledge of all of the officers' pooled knowledge giving rise to reasonable suspicion or probable cause, the officer must be aware of at least some of the critical facts and must have been in communication with others who have such knowledge.

In the circumstances here, some, but not all, of the other investigating officers' knowledge can be imputed to the acting officer. We conclude that, with or without this imputed knowledge, the officer who stopped the defendant had reasonable suspicion to do so.

1. Background. a. Facts. We summarize the relevant facts concerning the stop from the motion judge's findings, supplemented by uncontroverted and undisputed facts from the record that have been credited by the motion judge, leaving

certain details for later discussion. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015). Three Boston police officers testified at the evidentiary hearing on the motion to suppress: Officer Brian Doherty, Lieutenant Darrell Dwan,[1] and Officer Luis Lopez. The motion judge found each testifying officer credible without qualification.

On August 12, 2018, Doherty, who was assigned to the police department's C-11 district, was working the midnight shift and covering the Clam Point area of Dorchester. He was in plain clothes and driving an unmarked vehicle. At approximately 3:35 A.M., Doherty received a police department radio transmission over channel six[2] reporting that there had been an armed robbery at a gasoline station on Morrissey Boulevard. The dispatcher thereafter transmitted a description of the suspect as "Black male, late twenties, five foot seven, blue hoodie, blue jeans, on foot towards [a pharmacy]." In the first dispatch, there was no mention of the suspect having facial hair.

Officers continued to communicate via channel six. Dwan, who was canvassing the surrounding streets, reported at

---

[1] At the time of the robbery, Dwan held the rank of sergeant.

[2] Channel six is the dedicated police channel for the C-11 area and is transmitted to the entire district.

3:37 A.M. that no one was present on his part of Morrissey Boulevard.[3]  Over the course of the next seven minutes, the dispatcher transmitted two additional descriptions of the suspect over channel six.  A second transmission was broadcast at 3:38 A.M. and described the suspect as being "a Black male, twenty-eight, twenty-nine, medium build, five foot seven, five foot eight, blue hoodie, blue jeans, with facial hair, silver firearm."  The final description was dispatched at 3:41 A.M., and described the suspect as a "Black male, twenty-eight, twenty-nine, medium build, five foot seven, five foot eight, blue hoodie, blue jeans, some facial hair."[4]

In response to the dispatched report of the armed robbery, Doherty headed toward the area near the pharmacy from the police station where he had been working.  At that time, Doherty had been a Boston police officer for four years and had been working in Clam Point for two years.  He also had grown up a few blocks away from the scene of the robbery.  Doherty was aware of a large gap in a fence that separated Morrissey Boulevard and Ashland Street not far from the scene.  As he was responding to the dispatch, Doherty drove through approximately nine streets

---

[3] Dwan confirmed via channel six that no one was present on Morrissey Boulevard.  The recordings of the dispatches, which were introduced in evidence, support this testimony.

[4] Dwan testified that he heard updated descriptions of the suspect and that he knew the suspect had facial hair.

without seeing anyone else outside; he was monitoring channel six while driving.  Seven minutes after the robbery, Doherty came across the defendant on Ashland Street.

When Doherty saw the defendant at 3:41 A.M., it was raining and dark.  Doherty observed that the individual walking toward him was a Black male with facial hair, wearing a green sweater and black jeans, and of the same approximate age as the broadcast description.  At the time of the encounter, the defendant was five feet, eleven inches tall and thirty-two years old.  Doherty pulled over and parked, identified himself as "Boston Police," and told the defendant to "show me your hands." The defendant complied; he made no attempt to run or to evade the officer.  Doherty then conducted a patfrisk of the defendant and felt a large wad in the defendant's pocket.  Doherty instructed the defendant to remove what was in his pocket, which turned out to be $432.  No weapons were recovered from the defendant's person.

Dwan arrived at the corner of Ashland Street and Everdean Street, from the opposite direction, at the same time that Doherty reached that location.  As Dwan approached the defendant from behind, he saw that the defendant was wearing a red plaid backpack.  Dwan pat frisked the backpack, without opening it, and felt a hard object near the top.  Upon opening the backpack, Dwan saw a silver gun.

Lopez also was on duty on the night of the robbery. In response to the communications on channel six, Lopez drove around the surrounding Clam Point neighborhood, focusing his efforts on Victory Road and the area near the pharmacy. Nothing in the record indicates that Lopez communicated with anyone during his surveillance, nor that he was involved in the stop of the defendant. After observing no one in the area, Lopez transported the victim to the scene of the stop for a showup identification. Following a positive identification by the victim, the defendant was arrested.

b. Procedural background. On October 10, 2018, a grand jury returned indictments charging the defendant with five firearms offenses.[5] He filed a motion to suppress the evidence obtained as a result of the stop, the patfrisk of his person, and the patfrisk of his backpack. He also moved to suppress the subsequent showup identification. Following an evidentiary hearing, a Superior Court judge denied the defendant's motion.

In her findings, the motion judge reasoned that Doherty had had adequate reasonable suspicion to conduct the investigatory stop based on the defendant's presence "in the locus of the

---

[5] The charges included armed robbery, G. L. c. 265, § 17; possession of a firearm during the commission of a felony, G. L. c. 265, § 18B; possession of a firearm as an armed career criminal, G. L. c. 269, §§ 10 (a), 10G (b); possession of ammunition without a firearm identification card, G. L. c. 269, § 10 (h); and carrying a loaded firearm, G. L. c. 269, § 10 (n).

robbery and within minutes of its occurrence." She also considered the early morning hour, the fact that the defendant was the only person observed in the area, and the fact that he fit the general description that was broadcast on channel six.

The defendant filed an application for leave to pursue an interlocutory appeal in the county court pursuant to Mass. R. Crim. P. 15 (a) (2), as amended, 476 Mass. 1501 (2017). The single justice allowed the application and ordered the appeal to proceed in the Appeals Court. The Appeals Court affirmed the denial of the motion to suppress. See Commonwealth v. Privette, 100 Mass. App. Ct. 222, 222-223 (2021). In its calculus of reasonable suspicion, the Appeals Court supplemented the motion judge's findings by imputing to Doherty Dwan's knowledge that the suspect had a beard and that Dwan saw no one walking in the area of Morrissey Boulevard or Victory Road. Id. at 228. The Appeals Court also imputed to Doherty Lopez's knowledge that no one had been present in the area of Victory Road. Id. In affirming the denial of the motion to suppress, the Appeals Court held that the defendant's appearance, his proximity to the scene, and the fact that he was the only person outside in the surrounding area all supported a determination that there was reasonable suspicion. Id. at 231-233. We granted the defendant's application for further appellate review.

2. <u>Discussion</u>.  On appeal, the defendant challenges only the validity of the stop.  He does not challenge the patfrisk of his person or his backpack, nor does he challenge the identification procedure.  Thus, the narrow question before us is whether the investigatory stop was constitutionally permissible.

a.  <u>Standard of review</u>.  In reviewing a ruling on a motion to suppress, we accept the motion judge's findings of fact absent clear error.  Commonwealth v. <u>Tremblay</u>, 480 Mass. 645, 652 (2018).  We conduct an independent review of the judge's application of constitutional principles to the facts found.  <u>Commonwealth</u> v. <u>Mercado</u>, 422 Mass. 367, 369 (1996).

b.  <u>Reasonable suspicion</u>.  Article 14 provides that "[e]very subject has a right to be secure from all unreasonable searches, and seizures, of his person."  To justify an investigatory stop under art. 14, a police officer must have reasonable suspicion that the person stopped has committed, is committing, or is about to commit a crime.  <u>Commonwealth</u> v. <u>Costa</u>, 448 Mass. 510, 514 (2007).  The reasonable suspicion analysis examines "the totality of the facts on which the seizure is based."  <u>Commonwealth</u> v. <u>Meneus</u>, 476 Mass. 231, 235 (2017).  Reasonable suspicion "must be based on specific and articulable facts, and reasonable inferences therefrom, in light of the officer's experience" (citation omitted).  <u>Commonwealth</u>

v. Gomes, 453 Mass. 506, 511 (2009). See Terry v. Ohio, 392 U.S. 1, 21 (1968). Reasonable suspicion also must be more than a hunch. Commonwealth v. Lyons, 409 Mass. 16, 19 (1990).

As an initial matter, the motion judge found, and the parties agree, that the defendant was seized when Doherty announced to him, "Boston Police," and told him to "show me your hands." The question before us is whether Doherty had reasonable suspicion to justify the stop. This, in turn, implicates the narrow legal issue whether Dwan's and Lopez's knowledge and observations that night may be imputed to Doherty, under the collective knowledge doctrine.

i. Collective knowledge doctrine. The collective knowledge doctrine, sometimes referred to as the fellow officer rule, originated in Williams v. United States, 308 F.2d 326, 327 (D.C. Cir. 1962), where the United States Court of Appeals for the District of Columbia Circuit rejected a defendant's assertion that the arresting officer was required to have had firsthand information in order to make an arrest. The court concluded that "the collective knowledge of the organization as a whole can be imputed to an individual officer when he is requested or authorized by superiors or associates to make an arrest." Id. The United States Supreme Court subsequently adopted the doctrine. See Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971). The Court initially

concluded that "[c]ertainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause." See id. The Court later held that, in forming reasonable suspicion for an investigatory stop, officers could rely on a police bulletin issued by another police department, even though the acting officers were not "themselves aware of the specific facts which led their colleagues to seek their assistance." See United States v. Hensley, 469 U.S. 221, 231 (1985).

More recently, the collective knowledge doctrine has evolved into two different types: horizontal collective knowledge and vertical collective knowledge. Each is used in determining the existence of reasonable suspicion and probable cause. See United States v. Massenburg, 654 F.3d 480, 495-496 (4th Cir. 2011) (distinguishing between horizontal and vertical collective knowledge and analyzing collective knowledge doctrine as it applies to reasonable suspicion); United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008), cert. denied, 555 U.S. 1121 (2009) (analyzing probable cause based on collective knowledge).

Vertical collective knowledge, the original version of the doctrine, involves one officer directing or requesting another

officer to conduct a stop, frisk, search, or an arrest. Courts review the validity of the intrusion based on the directing officer's knowledge. See Massenburg, 654 F.3d at 493 ("the collective-knowledge doctrine simply directs us to substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer"). In this context, it is not necessary for the acting officers to have personal knowledge of the facts establishing reasonable suspicion or probable cause, because the acting officers "are acting as the agents or proxies of, or are relying on information provided by, the officers who possess probable cause or reasonable suspicion." United States v. Gorham, 317 F. Supp. 3d 459, 473 (D.D.C. 2018).

The horizontal knowledge doctrine, by contrast, permits the aggregation of information known to multiple officers; no one officer need have sufficient information to support probable cause or reasonable suspicion. Instead, "a number of individual law enforcement officers have pieces of the probable cause puzzle" that are aggregated to meet the threshold. See Chavez, 534 F.3d at 1345. Under the horizontal collective knowledge doctrine, officers are not acting at the direction of another, as they would be under the vertical collective knowledge doctrine. See Commonwealth v. Yong, 644 Pa. 613, 636, cert. denied, 139 S. Ct. 374 (2018) (doctrine of horizontal collective

knowledge is one in which "the arresting officer does not have the requisite knowledge and was not directed to so act").

Reliance upon vertical collective knowledge has sparked little controversy and is supported by the United States Supreme Court's decision in Hensley, 469 U.S. at 231 ("this rule is a matter of common sense"). By contrast, both Federal and State courts are split over how broadly to apply the horizontal outgrowth of the collective knowledge doctrine, the question at issue here. Moreover, further complicating the issue, notwithstanding the evolution of the doctrine into these two distinct approaches, not all fact patterns will necessarily fall squarely within either the vertical or horizontal framework. See Yong, 644 Pa. at 636, citing Chavez, 534 F.3d at 1345 n.12.

At this point, those courts to have addressed the question of horizontal collective knowledge have required communication between officers prior to an intrusion, a joint cooperative effort, close physical proximity, or some combination thereof. See, e.g., Grassi v. People, 2014 CO 12, ¶ 1, cert. denied, 574 U.S. 1014 (allowing imputation of collective knowledge to officer only if "(1) that officer acts pursuant to a coordinated investigation and (2) the police possess the information at the time of the search or arrest"). To date, courts have developed at least three variations of the horizontal collective knowledge doctrine.

The United States Courts of Appeals for the Second, Fourth, and Tenth Circuits, and a plurality of the States[6] to have addressed the issue, have required evidence that the actual facts underlying the analysis of reasonable suspicion or probable cause be communicated to the acting officer prior to the stop, frisk, search, or arrest. See, e.g., United States v. Hussain, 835 F.3d 307, 316 n.8 (2d Cir. 2016).

The United States Court of Appeals for the Fourth Circuit discussed this approach in some detail in Massenburg, 654 F.3d at 491-496. The court noted concerns about the effect that after-the-fact aggregation of information would have on the exclusionary rule. "Because it jettisons the present requirement of communication between an instructing and an acting officer, officers would have no way of knowing before a

---

[6] See People v. Chalak, 48 Cal. App. 5th Supp. 14, 20 (2020); State v. Cooley, 457 A.2d 352, 353 (Del. 1983); Montes-Valeton v. State, 216 So. 3d 475, 479 (Fla. 2017); State v. Fischer, 230 Ga. App. 613, 614 (1998), overruled on other grounds by Workman v. State, 235 Ga. App. 800, 803 (1998); State v. Barnes, 58 Haw. 333, 336-337 (1977); State v. Amstutz, 169 Idaho 144, 148 (2021); People v. Creach, 69 Ill. App. 3d 874, 882 (1979); State v. M.J.M., 837 N.E.2d 223, 226 (Ind. Ct. App. 2005); State v. Miller, 49 Kan. App. 2d 491, 497 (2013); State vs. Giannini, N.M. Ct. App., No. 34,199, slip op. at 5 (July 20, 2016); State v. Battle, 109 N.C. App. 367, 371 (1993); State v. Rahier, 2014 ND 153, ¶ 15; State v. Ojezua, 2016-Ohio-2659, ¶¶ 38-40 (App. Ct.); State v. Mickelson, 18 Or. App. 647, 650 (1974); State v. Mohr, 2013 S.D. 94, ¶ 18; State v. Echols, 382 S.W.3d 266, 278 (Tenn. 2012); McArthur v. Commonwealth, 72 Va. App. 352, 365 (2020); Guandong v. State, 2022 WY 83, ¶¶ 19-20.

search or seizure whether the aggregation rule would make it legal, or even how likely that is." Id. at 494. Jurisdictions adopting this approach have explained that the deterrent effect of the exclusionary rule would be greatly limited without a requirement of communication; the absence of such a requirement could create incentives for officers to conduct illegal searches and seizures, knowing that there was no reasonable suspicion or probable cause, on the slim chance that someone else on the team had had the requisite information. See id. ("Perhaps an officer who knows she lacks cause for a search will be more likely to roll the dice and conduct the search anyway, in the hopes that uncommunicated information existed"). See McArthur v. Commonwealth, 72 Va. App. 352, 365 (2020) (citing similar concerns that "the legality of a warrantless search would depend solely on whether officers [were] able to gather information held by other officers, after-the-fact, to create reasonable suspicion or probable cause").

Another concern that has been mentioned with the aggregation of uncommunicated information is that it could reward police officers who were acting in bad faith; for example, investigatory teams invariably could find sufficient probable cause or reasonable suspicion based on information that had been learned after the stop. See Gorham, 317 F. Supp. 3d at 473, citing Massenburg, 654 F.3d at 494. For these reasons,

jurisdictions that limit the horizontal collective knowledge doctrine require communication of the pertinent information prior to permitting it to be factored into the calculus of reasonable suspicion or probable cause.  See, e.g., Chavez, 534 F.3d at 1345, citing United States v. Shareef, 100 F.3d 1491, 1504 (10th Cir. 1996) ("In such situations, the court must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold"); State v. M.J.M., 837 N.E.2d 223, 226 (Ind. Ct. App. 2005) ("In order to rely on collective knowledge, the knowledge sufficient for reasonable suspicion must be conveyed to the investigating officer before the stop is made").

Following a decision by the United States Court of Appeals for the Fifth Circuit, see United States v. Ragsdale, 470 F.2d 24, 30 (5th Cir. 1972), a small number of jurisdictions have adopted an exception to the requirement that the acting officer act with awareness of the other officers' knowledge, sometimes known as the inevitable discovery exception, see 2 W.R. LaFave, Search & Seizure § 3.5(c), at 351-352 (6th ed. 2020).  See, e.g., Hurlburt v. State, 425 P.3d 189, 194-195 (Alaska Ct. App. 2018) (adopting inevitability exception in analysis of reasonable suspicion in case involving driving under influence); State v. Ochoa, 131 Ariz. 175, 178 (Ariz. Ct. App. 1981)

(declining to hold intrusion was unconstitutional "simply because a member of the team having less knowledge than the others moved too quickly and did what the more knowledgeable members of the team would imminently and lawfully have done"); Smith v. State, 719 So. 2d 1018, 1023 (Fla. Dist. Ct. App. 1998) ("when the officer who does possess the probable cause is in a close time-space proximity, evidence of a direct communications link between the officers is not necessarily required"); Yong, 644 Pa. at 636 ("we hold the seizure is still constitutional where the investigating officer with probable cause or reasonable suspicion was working with the officer and would have inevitably and imminently ordered that the seizure be effectuated").

The second approach to the horizontal collective knowledge doctrine requires communication amongst officers to establish that they are engaged in a joint effort, even though explicit communication of the underlying facts supporting reasonable suspicion or probable cause is not necessary. To date, a plurality of United States Courts of Appeals, and a handful of States, have permitted aggregation, so long as there is evidence of some communication between the officers involved in the investigation; relaying the specific facts that provided the basis for reasonable suspicion or probable cause generally has not been required. See United States v. Ramirez, 473 F.3d 1026,

1032, 1037 (9th Cir. 2007). See, e.g., State v. Breeding, 200 So. 3d 1193, 1200 (Ala. Crim. App. 2015), quoting United States v. Esle, 743 F.2d 1465, 1476 (11th Cir. 1984), overruled on other grounds by United States v. Blankenship, 382 F.3d 1110, 1122 n.23 (11th Cir. 2004) ("[I]t is a 'well-recognized principle that, where a group of officers is conducting an operation and there is at least minimal communication among them, [the appropriate course is to] look to the collective knowledge of the officers in determining probable cause'").

For instance, the United States Court of Appeals for the Fifth Circuit has held that "probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest, when there is some degree of communication between" those officers (quotations and citation omitted). United States v. Kye Soo Lee, 962 F.2d 430, 435 (5th Cir. 1992), cert. denied, 506 U.S. 1083 (1993). See United States v. Ibarra, 493 F.3d 526, 530 (5th Cir. 2007) ("Under the collective knowledge doctrine, it is not necessary for the arresting officer to know all of the facts amounting to probable cause, as long as there is some degree of communication between the arresting officer and an officer who has knowledge of all the necessary facts"). The United States Court of Appeals for the Sixth Circuit permits the knowledge of a group of officers to "be considered in determining probable cause, not

just the knowledge of the individual who physically effected the arrest," so long as the "agents [were] in close communication with one another."  United States v. Blair, 524 F.3d 740, 752 (6th Cir. 2008), quoting United States v. Woods, 544 F.2d 242, 260 (6th Cir. 1976).  Otherwise put, the requirement of communication "serves to distinguish between officers functioning as a 'search team,' and officers acting as independent actors who merely happen to be investigating the same subject" (citation omitted).  United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir.), cert. denied, 534 U.S. 982 (2001).

Finally, the minority view, which has been adopted by the United States Courts of Appeals for the First and Third Circuits, and a handful of States (including, to date, Massachusetts), has allowed information to be aggregated amongst officers even absent evidence of any sort of communication between them.  See, e.g., United States v. Cruz-Rivera, 14 F.4th 32, 44 (1st Cir. 2021), cert. denied, 142 S. Ct. 1456 (2022), quoting United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017) ("we 'look to the collective information known to the law enforcement officers participating in the investigation rather than isolat[ing] the information known by the individual arresting officer'"); United States v. Whitfield, 634 F.3d 741, 746 (3d Cir. 2010) ("it would be impractical to expect an

officer in such a situation to communicate to the other officers every fact that could be pertinent in a subsequent reasonable suspicion analysis"); State v. Goff, 129 S.W.3d 857, 863 (Mo. 2004) (declining to require specific communication between officers in order to aggregate information in making determination of reasonable suspicion or probable cause). See also Mendez, 476 Mass. at 519 n.8 (imputing uncommunicated knowledge from one officer to another in calculus of reasonable suspicion). These jurisdictions reason that no communication is required because the officers are working together on the same investigation; the officers thus have a "nexus to the investigation," Goff, supra, are "involved in the [same] investigation," United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002), or are acting as a "single organism," Shareef, 100 F.3d at 1504 n.6.

ii. Horizontal collective knowledge doctrine under art. 14. The defendant urges us to reject all forms of the horizontal collective knowledge doctrine; he argues that the doctrine of horizontal collective knowledge undermines the deterrent effect of the exclusionary rule and is offensive to the requirements of art. 14. The Commonwealth argues that we need not reach the issue here, because Doherty had reasonable suspicion without imputing the knowledge of Dwan and Lopez to him.

We conclude that, to comport with art. 14, application of the horizontal collective knowledge doctrine must be limited, but not so much so that it disregards the practical reality of effective law enforcement. See Beck v. Ohio, 379 U.S. 89, 91 (1964) ("The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice" [citation omitted]).

Where there is no directive or instruction from a superior officer, in order to aggregate officers' knowledge for use in the determination of reasonable suspicion without running afoul of art. 14, the officers must be involved in a joint investigation, with a mutual purpose and objective, and must be in close and continuous communication with each other about that objective. See, e.g., United States v. Sandoval-Venegas, 292 F.3d 1101, 1105 (9th Cir. 2002). While the acting officer need not have knowledge of all of the facts giving rise to reasonable suspicion or probable cause, the officer must have knowledge of at least some of the critical facts. See, e.g., United States v. Bernard, 623 F.2d 551, 560-561 (9th Cir. 1979).

In order for their knowledge to be pooled such that "[i]n effect all of them participated in the decision to make the

arrests," Bernard, 623 F.2d at 560, the officers must be actively involved in the same investigation, with a shared and mutual objective. See United States v. Nafzger, 974 F.2d 906, 914 (7th Cir. 1992) (all officers "were part of a coordinated investigation" of defendant who was suspected of being involved in organized crime ring). The officers must be "functioning as a team," as opposed to working as "independent actors who merely happen to be investigating the same subject" (citation omitted). See Ramirez, 473 F.3d at 1033; Gillette, 245 F.3d at 1034.

"'Working as a team' is also conceptualized as agents working 'in close communication with one another.'" United States v. Duval, 742 F.3d 246, 253 (6th Cir.), cert. denied, 574 U.S. 823 (2014), quoting Woods, 544 F.2d at 260. See, e.g., Sandoval-Venegas, 292 F.3d at 1105-1106 (detectives investigating bank robbery "were in continuous collective contact" during pursuit of robber, and one of detectives at scene of arrest knew of facts establishing probable cause and was standing at elbow of officer who made arrest, such that arresting officer need not be viewed as "an island," but, rather, "their pooled knowledge" could be considered to support probable cause for apprehension of suspected robber). "The inquiry in such a circumstance is 'whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge' to

satisfy the relevant standard." United States v. Whitley, 680 F.3d 1227, 1234 n.3 (10th Cir. 2012), quoting Chavez, 534 F.3d at 1345.

For officers in a joint investigation to be considered in close communication, they must be continuously conferring with each other throughout the course of the investigation, exchanging information to the extent possible. See State v. Barnes, 58 Haw. 333, 336 (1977), and cases cited ("While police officers are acting in concert and are keeping each other informed of the progress of a particular investigation, the knowledge of each is deemed to be the knowledge of all").

"Basing the legitimacy of the stop solely on what the officer who first approaches the suspect knows" rather than on the collective knowledge of the officers involved and communicating throughout the stop "makes little sense from a practical standpoint." See United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002). At the same time, the doctrine of horizontal collective knowledge "does not allow officers to make arrests without probable cause simply because some other officer, somewhere, has probable cause to arrest." See Ochoa, 131 Ariz. at 177. Although all the information giving rise to reasonable suspicion or probable cause need not be explicitly communicated to the acting officer, some of the "critical information" supporting the constitutional justification must be

shared with, or otherwise known to, that officer, and the exchange of information among the group of officers must be such that "the knowledge of one of them [is] the knowledge of all" (citation omitted).  Bernard, 623 F.2d at 561.

This approach duly balances the right of individuals to be free from unreasonable searches and seizures with the practical needs of officers jointly conducting investigations that are unfolding from moment to moment.  See Commonwealth v. Feliz, 486 Mass. 510, 515 (2020), quoting Commonwealth v. Catanzaro, 441 Mass. 46, 56 (2004) ("There is no ready test for reasonableness except by balancing the need to search or seize against the invasion that the search or seizure entails").  See also Cook, 277 F.3d at 86 ("common sense and practical considerations must guide judgments about the reasonableness of searches and seizures").  It provides flexibility in "dynamic environment[s] marked by the potential for violence," where officers may have no opportunity to communicate each piece of relevant information during the course of the stop, see id., while nonetheless necessitating general communication amongst officers in order for a stop to pass constitutional muster.

The approach suggested by Justice Cypher, by contrast, would allow post hoc rationalizations by scouring all of the information any number of officers had gathered on a particular subject, over an unlimited time frame and in any location, to

cobble together a justification for the stop. Indeed, in her view, the officer making the stop would not have to have knowledge of any of the facts establishing reasonable suspicion to conduct the stop, nor would any other individual officer.

The approach suggested by Justice Wendlandt, on the other hand, would require officers who have been in hot pursuit of a fleeing suspect, communicating over police radio broadcasts, to stop and confer with each other about the facts known to each of them before deciding whether they had sufficient information to stop the suspect, who would be unlikely to stand and wait for this conference to end before continuing to flee. We discern no reason why police using electronic communication while in pursuit should be held to this heightened standard. See Hensley, 469 U.S. at 231, quoting United States v. Robinson, 536 F.2d 1298, 1300 (9th Cir. 1976) ("effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and . . . officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information"). Where each officer has communicated his or her knowledge to the others during the course of the pursuit, this shared knowledge is sufficient to establish reasonable suspicion, and the officer conducting the stop is

aware of some of the critical elements, the requirements of art. 14 are satisfied.

Contrary to Justice Wendlandt's assertions, our approach would not permit an officer on patrol to stop an individual at random and then attempt to create a post hoc justification based on other officers' knowledge from some previous investigation. The officers all must be involved in a joint, ongoing investigation, and in close communication as they pursue the suspect. Although Justice Wendlandt views the stop here as "rest[ing] on the hope that, post hoc, a judge will cobble together information known to other officers on the team" about which the acting officer is "entirely ignorant and has no basis to believe is known to a fellow officer," post at    , in actuality, the officer who had heard the information about the suspect having a beard was standing at the elbow of the officer who initiated the stop, just as Justice Wendlandt states would be acceptable under the inevitable discovery exception to the exclusionary rule. See post at    . Use of the inevitable discovery exception would not, however, address all circumstances that officers might encounter in the course of a developing, real-time pursuit. Here, for instance, had Dwan turned onto another road perpendicular to Morrissey Boulevard and within blocks of the scene of the crime, he would have been heading in a completely different direction from the location of

the stop, and yet still in the reported path of flight; and he might not have encountered the defendant before he was able to reach nearby commercial areas from which the defendant might have been able to perfect an escape.

The approach we adopt balances the right of the suspect to be free from unreasonable searches, with the need of law enforcement and the public to stop someone who is fleeing the scene after having committed a violent crime before further violence is visited upon the public. See Terry, 392 U.S. at 27. As Justice Wendlandt asserts, post at    , quoting Terry, supra at 10, Terry's "strictly circumscribed permission was designed to give the officer on the scene 'an escalating set of flexible responses, graduated in relation to the amount of information' possessed by the officer, during the 'rapidly unfolding and often dangerous situations' the officer faces, especially in the nation's cities." Her approach, however, distorts this balance.

Accordingly, here, we conclude that Dwan's knowledge may be considered in the calculus of reasonable suspicion pursuant to the horizontal collective knowledge doctrine, but we decline to impute Lopez's knowledge to Doherty. The defendant maintains that Lopez's knowledge may not be imputed to Doherty because there is no evidence that Lopez communicated the results of his search. We agree with the defendant that Lopez's knowledge may not be imputed, but for a different reason: there is no

evidence in the record indicating that Lopez communicated at all with Doherty or over channel six prior to the stop of the defendant. Thus, despite being involved in a joint effort, the continuous communication requirement was not met, and Lopez's knowledge of the absence of people in the area of Victory Road therefore cannot be imputed to Doherty. See Commonwealth v. Hawkins, 361 Mass. 384, 386-387 & n.3 (1972) (declining to impute knowledge about stolen bonds to officers who seized bonds, absent probable cause, where there was no evidence of communication or cooperative effort). See, e.g., United States v. Villasenor, 608 F.3d 467, 476-477 (9th Cir.), cert. denied, 562 U.S. 1020 (2010) (declining to aggregate knowledge of immigration and customs enforcement agents and inspectors of customs and border protection where "[t]he record [was] devoid of any communication" amongst agents).

The defendant also argues that the motion judge did not find the predicate facts that would permit any application of the horizontal collective knowledge doctrine here. Specifically, the defendant maintains that, by omitting mention of the beard from her analysis of reasonable suspicion, the judge actually made a contrary finding that neither Doherty nor Dwan had had knowledge of the subsequent dispatches that reported that the suspect had facial hair. The defendant contends that the judge's omission itself was a finding.

We do not read the judge's findings so narrowly.  The only finding the judge made with respect to the description of facial hair was in a footnote, in which the judge noted that "[t]here was no mention in the original broadcast about facial hair (emphasis added)."  Thus, it is unclear whether the judge found that Doherty heard the subsequent two broadcasts.  Even if we were to assume that this footnote was a finding that Doherty did not hear the subsequent broadcasts detailing the additional descriptions that mentioned facial hair, the record makes clear that Dwan did hear them, and thus, we impute his knowledge to Doherty.

"[A]n appellate court may supplement a motion judge's subsidiary findings with evidence from the record that 'is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony.'"  Jones-Pannell, 472 Mass. at 431, quoting Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007).  Any supplemental facts taken from the record "may not contradict the motion judge's findings."  Commonwealth v. Garner, 490 Mass. 90, 94 (2022), citing Isaiah I., supra.  Nor does "a general statement crediting witness testimony mean[] that every statement the witness makes on the stand is automatically a fact found by the motion judge."  Garner, supra.

Here, the audio recordings from the dispatch, which were introduced at the hearing, as well as Dwan's testimony, confirm

that Dwan was actively engaged in communications with the dispatcher who relayed the later descriptions.  None of this information is contrary to any of the judge's findings or ultimate conclusions of law, and the judge did not reject any part of Dwan's testimony as not credible.  Accordingly, we can conclude, consistent with the judge's findings, that Dwan was aware that the suspect had been described as having facial hair. See Jones-Pannell, 472 Mass. at 431.

Given this, Dwan's knowledge may be imputed to Doherty through the horizontal collective knowledge doctrine.  Dwan and Doherty were actively working on apprehending the suspect involved in the armed robbery; indeed, they arrived at the scene of the stop contemporaneously.  The two officers jointly conducted a patfrisk of the defendant's person and backpack. This is more than sufficient to be considered a joint investigation for a shared, mutual objective.  See Sandoval-Venegas, 292 F.3d at 1104 (upholding arrest that was "the culmination of the efforts of two detectives who were working together, in close communication and consultation, and who were both present at the arrest").  Additionally, Dwan continuously provided updates over channel six about the status of his investigation, which Doherty testified to having monitored. That Dwan was in continued, close communication with channel six, and with Doherty upon arrival, further supports application

of the horizontal knowledge doctrine.  See id.  This was not a case where Dwan and Doherty were working in isolation and "merely happen[ed] to be investigating the same subject."  See Gillette, 245 F.3d at 1034.  Accordingly, Dwan's information that the suspect had a beard, and that no one else was outside on Morrissey Boulevard or Victory Road, may be imputed to Doherty.

iii.  Over-all calculus of reasonable suspicion.  The defendant argues that, even taking account of all the circumstances, Doherty lacked reasonable suspicion at the time of the investigatory stop, and his motion to suppress should have been allowed.  We do not agree.

The similarity of the physical description of the suspect to the defendant, the temporal and physical proximity of the defendant to the scene of the robbery, and the context of the stop gave rise to reasonable suspicion, with or without the information that the suspect had facial hair.  See Commonwealth v. Henley, 488 Mass. 95, 103 (2021) ("Although, standing alone, any one of these factors might not have been sufficient to justify the stop, when viewed as a whole, . . . they gave rise to reasonable suspicion").

We have cautioned that a match between a defendant's appearance and a general description alone does not amount to reasonable suspicion, particularly if that general description

could fit a large number of people in the area where the stop occurred. See Commonwealth v. Warren, 475 Mass. 530, 535 (2016) (description of three Black males wearing dark clothing, with one wearing red hoodie, absent description of any facial features, hairstyles, height, weight, or other physical characteristics, was insufficient to establish reasonable suspicion); Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) ("the description of the suspect as a '[B]lack male with a black [three-quarter] length goose' could have fit a large number of men who reside in the Grove Hall section of Roxbury").

At the time of the stop here, however, Doherty knew that the suspect had been described as a Black male, twenty-eight or twenty-nine years old, with a medium build, and five feet, seven inches to five feet eight inches tall. He also knew that the suspect had been described as having facial hair, wearing blue jeans[7] and a blue hoodie, and carrying a silver firearm. The defendant generally matched the description of the suspect, in terms of age, height, skin tone, build, and facial hair. Thus, the correspondence between the defendant's appearance and the

---

[7] The judge found that the dispatched description of the suspect was for a male with dark jeans. The 911 call placed by the victim, however, as well as the radio transmission and Doherty's testimony at the hearing "make clear that the report said that the jeans were blue." Privette, 100 Mass. App. Ct. at 223 n.3.

description of the suspect was not so generalized as to preclude giving rise to reasonable suspicion.

Undoubtedly, the defendant's appearance did not match the description of the suspect in every particular. The defendant was wearing a green sweater, black jeans,[8] and a red plaid backpack. In context, the absence of the red backpack in the broadcast description is of little significance. Backpacks, like sunglasses, hats, or a mask, are easily worn, taken off, changed, or discarded. See Commonwealth v. Staley, 98 Mass. App. Ct. 189, 192 (2020).

In addition, as stated, the physical similarities between the defendant's appearance and the description of the suspect were supplemented by the defendant's geographic proximity to the location of the robbery within minutes of it having taken place. The defendant appears to suggest that his proximity to the scene weighs against a finding of reasonable suspicion, because had he been the robber, he would have traveled farther from the scene in the seven minutes that had elapsed since the robbery. See Warren, 475 Mass. at 536-537 (stop of defendant one mile from scene, twenty-five minutes later, where there was no reported

---

[8] Doherty initially testified that the defendant was wearing blue jeans, but, on cross-examination, after having had his recollection refreshed by the booking sheet, Doherty testified that the defendant's jeans were black. Both the Commonwealth and the defendant agree that the jeans he wore at the time of the stop were black.

flight path, had little weight in calculus of reasonable suspicion).  We are not convinced.

Here, there was a reported path of flight, and the defendant was found seven minutes after the initial dispatch on a street directly behind the gasoline station that had been robbed.  The defendant's location was consistent with the reported flight path, which was in the direction of the pharmacy on Morrissey Boulevard.  Both the timing and the location of the stop in relation to the armed robbery thus weigh in favor of a finding of reasonable suspicion.  See Warren, 475 Mass. at 536 ("Proximity is accorded greater probative value in the reasonable suspicion calculus when the distance is short and the timing is close").  Indeed, given the other circumstances present here, the physical description of the defendant's height, build, age, skin tone, clothing, and firearm was sufficient to establish reasonable suspicion even without any mention that the suspect had facial hair.

The defendant argues that being the only person in the area at that hour of the morning is not dispositive.  We agree that, taken alone, his location at the time of the stop would be insufficient to warrant a finding of reasonable suspicion.  But, given that he was the only person in the vicinity of the robbery at 3:43 A.M., in the rain, within seven minutes of the reported

robbery, the articulable facts combine to establish reasonable suspicion that the defendant had committed the armed robbery.

<u>Order denying motion to suppress affirmed</u>.

CYPHER, J. (concurring in part and dissenting in part).  I

agree with the court that Officer Brian Doherty had sufficient

reasonable suspicion to stop the defendant as a suspect in the

armed robbery.[1]  I disagree, however, that the court should

_____

[1] I agree with the court and with Justice Wendlandt that
reasonable suspicion in this case is not dependent on the
collective knowledge doctrine (therefore, I would have declined
to reach the application of the doctrine to this case and
beyond).  At around 3:36 A.M., Doherty received a radio
transmission indicating that there was an armed robbery of a
gasoline station on Morrissey Boulevard in the Dorchester
section of Boston, describing the suspect as "a Black male, late
twenties, medium build, five foot seven, blue hoodie, blue
jeans, on foot toward[]" a pharmacy.  Doherty was listening to
the police department radio channel as he headed to the area and
heard Lieutenant (then Sergeant) Daryl Dwan report that he did
not see anyone on Morrissey Boulevard.  Canvassing the nearby
Clam Point neighborhood, he drove through about nine additional
streets without seeing a single person.  Approximately seven
minutes after the dispatch, Doherty saw the defendant on a
street close to the gasoline station and easily accessible by an
opening in a fence or by walking along several streets.  The
defendant is a Black male, five feet, eleven inches tall, 220
pounds, and was thirty-two years old at the time, wearing a dark
sweater and jeans, and was the only person on the street at
approximately 3:30 A.M.  Even without considering the
defendant's beard, there was reasonable suspicion to stop him.
Commonwealth v. Evelyn, 485 Mass. 691, 704-705 (2020) (defendant
one-half mile away from location of crime thirteen minutes after
it occurred supported reasonable suspicion).  Contrast
Commonwealth v. Warren, 475 Mass. 530, 535-536 (2016) (no
reasonable suspicion where description was vague and did not
include "any information about facial features, hairstyles, skin
tone, height, weight, or other physical characteristics," but
recognizing "[p]roximity is accorded greater probative value
. . . when the distance is short and the timing is close").

Nonetheless, considering the record, it is very likely that
Doherty heard the dispatch including the description of facial
hair.  The description of the suspect having facial hair was
broadcast on the department channel at around 3:38 A.M., two

dismantle the collective knowledge doctrine as it has been discussed and appropriately applied in cases in this Commonwealth for more than fifty years. I would uphold the collective knowledge doctrine in situations where officers are engaged in a cooperative effort. I would not dissect whether officers are in sufficiently "close and continuous communication with each other" about their "shared objective," nor would I examine whether the acting officer is aware "of at least some of the critical facts" in determining whether to aggregate their knowledge. Ante at . I respectfully dissent.

I begin my analysis by considering the theoretical framework in which search and seizure analysis typically has been conducted, whether under the Fourth Amendment to the United States Constitution or art. 14 of our Declaration of Rights. Although the discussion of the utility of the collective knowledge doctrine concerns each officer's subjective knowledge

---

minutes after the first description, and at least three minutes before Doherty stopped the defendant. Although Doherty agreed with defense counsel on cross-examination that the first description was the only transmittal he heard before he stopped the defendant, he testified on direct examination, without prompting, that the call was for a man "with a beard," and affirmed that description on cross-examination. The motion judge made no finding addressing Doherty's knowledge of facial hair. Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015) (appellate court may supplement motion judge's findings of fact with uncontroverted record evidence where judge explicitly credited witness's testimony and where facts do not detract from judge's ultimate findings).

when working together with others, the reasons we do not consider the intent or motive of individual officers apply equally to knowledge and are instructive.  See, e.g., Commonwealth v. Long, 485 Mass. 711, 724 n.9 (2020) (in determining whether traffic stop was racially discriminatory, judge may consider whether officer observed or followed vehicle for extended period of time or whether officer would have been able to note defendant's race).

"Fourth Amendment doctrine, given force and effect by the exclusionary rule," is intended primarily to regulate the day-to-day activities of police officers and should be expressed in readily applicable terms for implementation by law enforcement. Clancy, The Purpose of the Fourth Amendment and Crafting Rules to Implement That Purpose, 48 U. Rich. L. Rev. 479, 505 (Jan. 2014), quoting New York v. Belton, 453 U.S. 454, 458 (1981).

> "A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be literally impossible of application by the officer in the field."

Clancy, supra, quoting Belton, supra.

Keeping that purpose in mind, "one of the main principles of Fourth Amendment analysis for many years has been the measurement of a police officer's intent by examining the objective aspects of the encounter, as opposed to inquiry into

the officer's actual, subjective intent."  T.K. Clancy, The

Fourth Amendment § 11.6.2.1, at 767 (3d ed. 2017).  See Brigham

City v. Stuart, 547 U.S. 398, 404 (2006), quoting Scott v.

United States, 436 U.S. 128, 138 (1978) ("An action is

'reasonable' under the Fourth Amendment, regardless of the

individual officer's state of mind, 'as long as the

circumstances, viewed objectively, justify [the] action'"

[emphasis added]); Indianapolis v. Edmond, 531 U.S. 32, 45

(2000) ("individual officer's subjective intentions are

irrelevant to the Fourth Amendment validity of a traffic stop

that is justified objectively by probable cause to believe a

traffic violation has occurred"); Bond v. United States, 529

U.S. 334, 338 n.2 (2000) ("The parties properly agree that the

subjective intent of the law enforcement officer is irrelevant

in determining whether that officer's actions violate the Fourth

Amendment"); Whren v. United States, 517 U.S. 806, 812-813

(1996) (decisions released by Court "foreclose any argument that

the constitutional reasonableness of traffic stops depends on

the actual motivations of the individual officers involved");

Newton, The Real-World Fourth Amendment, 43 Hastings Const. L.Q.

759, 770-771 (2016) ("As a general matter, courts assess whether

the Fourth Amendment was violated in a particular case by

applying an 'objective' standard. . . .  [T]he 'subjective'

mental states of both the police officers and the persons they

interacted with are generally irrelevant to the Fourth Amendment analysis"); Tomkovicz, Rehnquist's Fourth: A Portrait of the Justice as a Law and Order Man, 82 Miss. L.J. 359, 404-405 (2013), quoting Graham v. Connor, 490 U.S. 386, 396-397 (1989) (discussing Justice Rehnquist's approach to Fourth Amendment, "[e]valuations of reasonableness called for 'objective' inquiries that pay 'careful attention to the facts and circumstances of each particular case'"). But see Dix, Subjective "Intent" as a Component of Fourth Amendment Reasonableness, 76 Miss. L.J. 373 (2006) (critical analysis of objective standard); Kinports, Criminal Procedure in Perspective, 98 J. Crim. L. & Criminology 71 (2007) (arguing Court shifts from objective to subjective tests); Raigrodski, Reasonableness and Objectivity: A Feminist Discourse of the Fourth Amendment, 17 Tex. J. Women & L. 153 (2008) (discussing partiality in "objective" determinations of reasonableness); Kerr, The Questionable Objectivity of Fourth Amendment Law, 99 Tex. L. Rev. 447 (Feb. 2021) (challenging true objectivity in Fourth Amendment doctrine as applied by Court). "[A]lthough the framing-era sources did not always agree on the details of the criteria for regulating searches and seizures, they were united in seeking objective criteria to measure the propriety of governmental actions." Clancy, The Framers' Intent: John

Adams, His Era, and the Fourth Amendment, 86 Ind. L.J. 979, 980 (2011).

"Reasonableness and the balancing of interests under the Fourth Amendment is an objective inquiry." 1 J.W. Hall, Search and Seizure § 2.14 (5th ed. Supp. Oct. 2013). This inquiry is fact bound, and "is measured in objective terms by examining the totality of the circumstances." Id., quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996). "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving." Kentucky v. King, 563 U.S. 452, 466 (2011), quoting Graham, 490 U.S. at 396-397. The subjective intent of the officers is generally irrelevant; "the only real questions are what do the objective facts show and is this objectively reasonable?" Hall, supra. See 68 Am. Jur. 2d Searches and Seizures § 13 (2020) ("An action is reasonable under the Fourth Amendment regardless of the individual officer's state of mind as long as the circumstances, viewed objectively, justify the action; the officer's subjective motivation is irrelevant"). Even where an officer declared at the hearing on a motion to suppress that the officer did not believe he or she had sufficient facts to amount to probable cause, that personal opinion is not fatal to the Commonwealth's

case.  2 W.R. LaFave, Search and Seizure § 3.2(b), at 46 (6th ed. 2020).

> "[T]he mere subjective conclusions of a police officer concerning the existence of probable cause is not binding on this court which must independently scrutinize the objective facts to determine the existence of probable cause. . . .  Moreover, since the courts have never hesitated to overrule an officer's determination of probable cause when none exists, consistency suggests that a court may also find probable cause in spite of an officer's judgment that none exists."

LaFave, supra, quoting United States ex rel. Senk v. Brierley, 381 F. Supp. 447, 463 (M.D. Pa. 1974).  See Re, Fourth Amendment Fairness, 116 Mich. L. Rev. 1409, 1460 (June 2018) ("[P]olice can act reasonably without being motivated by the considerations that make their conduct reasonable. . . .  [Where there are reasonable grounds to act,] requiring that the officer correctly glean the proper basis for her actions would not afford innocent persons any greater protection, and insistence on police perfection would create windfalls for wrongdoers.  This default indifference to police motivation aligns with the case law, which focuses on objectively available reasons for action").

Correspondingly, in Massachusetts, "[s]ubjective intentions play no role" in the reasonable suspicion analysis.  J.A. Grasso, Jr., & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 4-3[b] (2022 ed.).  See Commonwealth v. Buckley, 478 Mass. 861, 865-866 (2018) ("under the authorization test, a stop is reasonable under art. 14 as long as there is a

legal justification for it"); Commonwealth v. Cruz, 459 Mass. 459, 462 n.7 (2011) ("The subjective intentions of police are irrelevant so long as their actions were objectively reasonable").  "Evaluating the validity of police conduct on the basis of objective facts and circumstances, without consideration of the subjective motivations underlying that conduct, is justified in part based on the significant evidentiary difficulties such an inquiry into police motives would often entail."  Buckley, supra at 867.  Only recently have we made an exception to the objective standard in search and seizure cases in which a defendant alleged race as the reason for a traffic stop based on a pretext; this exception is founded not on art. 14 or the Fourth Amendment, but on our equal protection jurisprudence set out in arts. 1 and 10 of the Declaration of Rights and the Fourteenth Amendment to the United States Constitution.  Long, 485 Mass. at 715, 729.[2]  The analysis

---

[2] See Long, 485 Mass. at 713 (establishing revised test for defendants seeking to suppress evidence obtained as result of racially motivated traffic stop); Commonwealth v. Lora, 451 Mass. 425, 426 (2008) (exclusionary rule applies to evidence from traffic stop violative of equal protection where stop was product of selective enforcement based on race).  In inventory and special needs searches and administrative inspections, the Supreme Court has looked to subjective intent in analyzing the validity of government action.  See Brigham City, 547 U.S. at 405, quoting Edmond, 531 U.S. at 46 ("we have held in the context of programmatic searches conducted without individualized suspicion -- such as checkpoints to combat drunk driving or drug trafficking -- that 'an inquiry into a

in such cases occasionally refers to an officer's intent, motivation, or state of mind; and in some instances, the officer's knowledge. See id. at 724-725 (listing factors judges should consider in applying totality of circumstances test to determine whether traffic stop was violative of equal protection); Commonwealth v. White, 469 Mass. 96, 101-102 (2014) (officer's examination of pills transformed search from inventory into investigatory); Commonwealth v. Judge, 95 Mass. App. Ct. 103, 108 (2019) (administrative and special needs searches may not become pretext for investigative search). See also Newton, The Real-World Fourth Amendment, supra at 771 ("There are some rare exceptions to the general 'objective' nature of legal analysis under the Fourth Amendment," such as police roadblocks).

---

programmatic purpose' is sometimes appropriate"); Whren, 517 U.S. at 812 ("we [have] never held, outside the context of inventory search or administrative inspection . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment"); Florida v. Wells, 495 U.S. 1, 4 (1990) (inventory search may not be "ruse for a general rummaging in order to discover incriminating evidence"). See also Commonwealth v. Judge, 95 Mass. App. Ct. 103, 108 (2019), quoting Commonwealth v. Carkhuff, 441 Mass. 122, 126 (2004) ("Administrative and special needs searches 'must be conducted as part of a scheme that has as its purpose something "other than the gathering of evidence for criminal prosecutions"'"). But see Commonwealth v. Feliz, 481 Mass. 689, 700 n.17 (2019), S.C., 486 Mass. 510 (2020) ("We have yet to justify searches of individuals on the basis of the special needs exception").

In other words, we always have examined the totality of the circumstances to determine whether a search or seizure was reasonable.  The reason for conducting an objective analysis includes the recognition that the Fourth Amendment, and art. 14, regulate conduct rather than thoughts.  See Ashcroft v. al-Kidd, 563 U.S. 731, 736 (2011).  "[I]njecting subjectivity into Fourth Amendment reasonableness would require officers to 'act on necessary spurs of the moment with all the knowledge and acuity of constitutional lawyers'" (citation omitted).  Barmore, Authoritarian Pretext and the Fourth Amendment, 51 Harv. C.R.-C.L. L. Rev. 273, 297 (2016).

Additionally, analyzing the intent behind an officer's actions "could cause unacceptable variation in the Fourth Amendment's application" where its focus on objectivity is meant to promote "evenhanded, uniform enforcement of the law." Barmore, supra at 298, quoting Ashcroft, 563 U.S. at 736.  As a practical matter, determining the nature of subjective motives underlying an individual officer's action is difficult.  See Brigham City, 547 U.S. at 405 ("It . . . does not matter here -- even if their subjective motives could be so neatly unraveled -- whether the officers entered the kitchen to arrest respondents and gather evidence against them or to assist the injured and prevent further violence"); Harlow v. Fitzgerald, 457 U.S. 800, 816-817 (1982) (in discussing qualified immunity, "[j]udicial

inquiry into subjective motivation therefore may entail broad-ranging discovery and deposing of numerous persons, including an official's professional colleagues," which may be "peculiarly disruptive of effective government").

For the same reasons, when several officers are working together, it will be difficult to decipher the precise knowledge that each individual officer had at various points in the investigation, whether the acting officer had knowledge of "some of the critical facts," and whether the communications between the officers were sufficiently close and continuous and touched on the "objective" of the police with respect to the investigation. Ante at    .  Taking into consideration the knowledge of all the officers involved in a police action is consistent with an objective analysis of the totality of the circumstances.  See Coleman, Beyond the Four Corners:  Objective Good Faith Analysis or Subjective Erosion of Fourth Amendment Protections?, 54 Mercer L. Rev. 1719, 1724 (2003) ("the objective standard is framed by the officer's knowledge and understanding of the requirements of the Fourth Amendment. . . . Objective good faith, then, rests on a foundation of Fourth Amendment compliance, not individualized, subjective knowledge of facts known only to the officer"); LaFave, supra at § 9.5(a), at 660-661 ("Certainly it is clear beyond question that the 'reasonable belief' required for arrest is not to be determined

by what the arresting officer did or did not believe, but rather by whether the available facts would 'warrant [an officer] of reasonable caution in the belief' that the person arrested had committed an offense. . . . [The reasonable suspicion] test, as is the case with the legal standard for arrest, is purely objective and thus there is no requirement that an actual suspicion by the officer be shown" [citation omitted]); R.G. Stearns, Massachusetts Criminal Law: A Prosecutor's Guide, Threshold Inquiries (42d ed. 2023), quoting Commonwealth v. Stoute, 422 Mass. 782, 790 (1996) ("facts must be assessed in light of the collective knowledge of the officers involved" and "[t]he test is an objective one, 'view[ing] the circumstances as a whole'"). Application of the court's new rule shifts the Fourth Amendment and art. 14 focus from the objective conduct of the police to the subjective thought process of the first officer to reach the suspect, and too closely examines the precise frequency and content of communications between officers cooperating in an investigation. I would keep the existing doctrine in place, in which a judge need not consider the inner workings of the minds of each individual officer at the relevant time, but the collective knowledge of all officers working together at the time of a stop, search, or arrest. Although I think that communication between officers is a good indicator that they are acting as a team, to inquire into the sufficiency

of the communications between collaborating officers in order to aggregate their knowledge will prove difficult for judges trying to apply the new rule, and for officers striving to integrate the court's holding into their daily practices.

In United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002), the United States Court of Appeals for the First Circuit discussed the reasoning supporting the aggregation of knowledge among officers who are collaborating in a joint effort and held that the knowledge of each officer should be imputed to all officers jointly involved in an investigative stop. "As the Supreme Court has repeatedly noted, common sense and practical considerations must guide judgments about the reasonableness of searches and seizures." Id. Imputing the knowledge of all the officers working together is practical where "[i]nvestigative stops generally occur in a dynamic environment marked by the potential for violence"; it would make little sense to base the legitimacy of the stop solely on the knowledge of the first officer to reach the suspect. Id. This takes into account the reality of many investigative stops conducted by multiple officers: "rarely will [officers] have an opportunity to confer during the course of the stop." Id.[3]

---

[3] Several jurisdictions have upheld the horizontal collective knowledge doctrine without requiring communication of specific facts among officers so long as they are working

together.  See United States v. Whitfield, 634 F.3d 741, 746 (3d Cir. 2010) ("It would make little sense to decline to apply the collective knowledge doctrine in a fast-paced, dynamic situation such as we have before us, in which the officers worked together as a unified and tight-knit team; indeed, it would be impractical to expect an officer in such a situation to communicate to the other officers every fact that could be pertinent in a subsequent reasonable suspicion analysis"); United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (reasonable suspicion determined from "collective knowledge of the officers"); United States v. Ledford, 218 F.3d 684, 689 (7th Cir. 2000) ("Because the search was a joint endeavor, the court may properly consider what . . . the other officers knew [in addition to the officer who opened the trunk during the search]. . . .  Were it otherwise, the validity of such jointly conducted searches might turn on the fortuity of which officer happened to open a trunk or door, notwithstanding the fact that he and his colleagues were acting in concert").  But see United States v. Ellis, 499 F.3d 686, 690 (7th Cir. 2007) (refusing to impute knowledge of one officer to another to validate decision to enter home because they were not in communication regarding suspect); United States v. Roberts, 410 F. Supp. 3d 1268, 1282 (N.D. Fla. 2019), quoting United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985) ("collective knowledge doctrine applies to cases in which the government agents maintained 'at least a minimal level of communication during their investigation'").  See also In re M.E.B., 638 A.2d 1123, 1129-1133 (D.C. 1993), cert. denied, 513 U.S. 883 (1994) (aggregating uncommunicated information between officers, holding that this result "recognizes that when faced with a fast moving sequence of events involving a number of police officers, a citizen's rights are protected if, at the time of the intrusion, the information collectively known to the police is constitutionally sufficient to justify that intrusion"); State v. Goff, 129 S.W.3d 857, 863-864 (Mo. 2004) ("collective information in the possession of those with a nexus to the investigation can be considered in determining whether reasonable suspicion existed," rejecting defendant's "argument that each officer is required to repeat his or her information to the officer making the stop in order to make the stop a constitutional one"); State v. Fioravanti, 46 N.J. 109, 122 (1965), cert. denied, 384 U.S. 919 (1966) ("Probable cause must be judged on the basis of [officers'] composite information, and if that knowledge in its totality shows probable cause, a police[ officer] who makes the arrest upon an ensuing order to do so, acts upon probable

This reasoning closely tracks the reasoning of the Supreme Court in United States v. Hensley, 469 U.S. 221, 231-232 (1985), in which it expanded on the collective knowledge doctrine by allowing reliance on a flyer or bulletin issued by another officer or police department to support a stop so long as the flyer or bulletin was issued on the basis of articulable facts supporting a reasonable suspicion. In making this determination, the Court recognized that the rule is a matter of "common sense," noting "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." Id. at 231, quoting United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir. 1976). Although in Hensley, the Court was grappling with the vertical collective knowledge doctrine, aggregating the knowledge of officers acting

---

cause"); People v. Gittens, 211 A.D.2d 242, 245-246 (N.Y. 1995) (knowledge of officers "working in close temporal and spatial proximity to one another" may be aggregated in reviewing propriety of action taken); Woodward v. State, 668 S.W.2d 337, 344 (Tex. Crim. App. 1982), cert. denied, 469 U.S. 1181 (1985) ("when there has been some cooperation between law enforcement agencies or between members of the same agency, the sum of the information known to the cooperating agencies or officers at the time of an arrest or search by any of the officers involved is to be considered in determining whether there was sufficient probable cause therefor").

together also recognizes the need for officers to act "swiftly" and efficiently.  Hensley, supra.

In Massachusetts, as in other jurisdictions, when analyzing probable cause, we look to the entire set of facts and circumstances within the knowledge of the police.  "[P]robable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense." Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992), quoting Commonwealth v. Storey, 378 Mass. 312, 321 (1979), cert. denied, 446 U.S. 955 (1980).  In discussing the collective knowledge doctrine, the Appeals Court has referred to Santaliz and the consideration of the "whole silent movie" as important to the probable cause determination.  Commonwealth v. Gant, 51 Mass. App. Ct. 314, 318 (2001) (aggregating observations of two separate officers to get to probable cause because "[b]oth officers were engaged in a cooperative effort in the investigation of this incident so that we may consider the complete picture"); Commonwealth v. Garcia, 34 Mass. App. Ct. 386, 393 n.8 (1993) (noting collective knowledge doctrine and probable cause standard).  "A reviewing court may consider the 'whole silent movie,' [Santaliz, supra at 242,] disclosed to the eyes of an experienced . . . . investigator rather than

'scrutinize in isolation' each of the facts and circumstances known to the officers." Gant, supra, quoting Commonwealth v. Kennedy, 426 Mass. 703, 708 (1998). See Hall, supra at § 6.10 ("Probable cause is viewed objectively by reviewing courts and is not based on the officer's subjective belief. If the rule were otherwise, the citizenry would have significantly diluted Fourth Amendment protection depending on whether the officer chose to obtain a warrant before the arrest or search based on subjective good faith. Only objective facts can be effectively reviewed"). The court's approach requires a judge hearing testimony in a motion to suppress, or a reviewing court, to determine the extent of cooperation and communication for every police move. Contrast Commonwealth v. Montoya, 464 Mass. 566, 576 (2013) (imputing knowledge of one officer to another, "regardless of whether" it was communicated immediately by radio).[4]

---

[4] The facts of the present case underscore the difficulty in determining precisely what was communicated to each officer at which point during the investigation. Determining whether each officer heard the communication regarding the beard before they approached the defendant brings the court into murky waters. Indeed, the motion judge avoided making any such finding. Although the court does not entirely discard the horizontal collective knowledge doctrine, the new rule still falls subject to this difficulty. In order to apply the doctrine, a judge will have to determine whether the acting officer had "critical information" supporting the intrusion and discern whether that officer was in continuous close communication with the other officers (with knowledge) specifically with respect to their

Similarly, when ascertaining whether reasonable suspicion was sufficient, we have objectively examined the totality of the specific, articulable facts presented. Commonwealth v. Meneus, 476 Mass. 231, 235 (2017). "The subjective intentions of police are irrelevant so long as their actions were objectively reasonable." Cruz, 459 Mass. at 462 n.7. It is of no matter whether an officer is acting in "good faith." Commonwealth v. Grandison, 433 Mass. 135, 139 (2001). See Commonwealth v. Gentile, 466 Mass. 817, 822 (2014). "Reasonable suspicion is measured by the 'totality of the circumstances' and from the collective knowledge of the officers involved in the stop." K. Wallentine, Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders 7 (2d ed. 2020), quoting United States v. Sokolow, 490 U.S. 1, 2 (1989).

With these principles in mind, aggregating the knowledge of officers working together in a cooperative effort in determining whether probable cause or reasonable suspicion was sufficient at the time of a stop or arrest conforms with our practice of analyzing a situation objectively, without regard to the subjective thought process of each separate officer involved. To confine the reasonable suspicion or probable cause analysis

shared objective. Ante at    . This requires the judge to delve into the subjective thought process of not one, but several different officers.

to the facts known by the first officer to approach a suspect or to those known by an officer with whom he was in continuous, close communications with, when that officer is working collaboratively with additional officers, would depreciate the objectivity of the analysis.[5]

Contrary to the defendant's assertion that Massachusetts dramatically has expanded and "strayed from its original efficiency rationale," Massachusetts applied the collective knowledge doctrine before the Supreme Court discussed the doctrine in Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971). See Stearns, supra, Searches Incident to Arrest ("Massachusetts cases apply the collective knowledge

---

[5] I agree with the court that the inevitable discovery exception is not an adequate substitute for the horizontal collective knowledge doctrine. Where evidence is discovered in a manner that would compel its exclusion at a criminal trial against the defendant, it may be admissible if the Commonwealth can show by a preponderance of the evidence "that discovery of the evidence by lawful means was certain as a practical matter, 'the officers did not act in bad faith to accelerate the discovery of evidence, and the particular constitutional violation is not so severe as to require suppression.'" Commonwealth v. Hernandez, 473 Mass. 379, 386 (2015), quoting Commonwealth v. Sbordone, 424 Mass. 802, 810 (1997). "This is a 'demanding test.'" Hernandez, supra, quoting Commonwealth v. Balicki, 436 Mass. 1, 16 (2002). In a situation where several officers are working as a team in pursuit of a suspect, and one officer catches the suspect, it would be near impossible for the Commonwealth to prove that his apprehension by another of the officers was practically certain. See Hurlburt v. State, 425 P.3d 189, 194-195 (Alaska Ct. App. 2018) (discussing aggregation of knowledge of collaborating officers based on "inevitable discovery" rationale only applies to "unusual facts").

doctrine in both the vertical and horizontal contexts, usually without drawing a formal distinction between the two").  In Commonwealth v. McDermott, 347 Mass. 246, 249-250 (1964), the court discussed an arrest pursuant to a lawful warrant.  The warrant permitted the arrest of any individual at a particular location "participating in any form of gaming," or any person present if gaming materials were found.  Id. at 247.  The first trooper on the scene saw the defendant registering bets.  Id. at 249.  When two police lieutenants arrived, the trooper told them the defendant had "the stuff in his pockets."  Id. at 248.  As the lieutenants questioned the defendant, the trooper observed booking paraphernalia, notebooks, and personal belongings of the defendant spread out on a counter.  Id.  The lieutenants, not the trooper, subsequently arrested him.  Id.  The court held, "It is without significance that [the trooper] was not [the] one who made the arrest.  The three officers were engaged in a cooperative effort in the performance of their duty.  The knowledge of one was the knowledge of all."  Id. at 249.  See Commonwealth v. Lanoue, 356 Mass. 337, 340 (1969) ("unnecessary for the detaining officer to know all the information pertaining to the incident" because knowledge of one is knowledge of all); Commonwealth v. Ballou, 350 Mass. 751, 757 (1966), cert. denied, 385 U.S. 1031 (1967) ("elementary rule of composite knowledge of

police officers engaged in a cooperative effort, where the knowledge of one may be the knowledge of all").

The court also has recognized certain circumstances in which the collective knowledge doctrine may not be applied. In Commonwealth v. Hawkins, 361 Mass. 384, 385 (1972), officers searched the defendant's apartment pursuant to a warrant authorizing a search for drugs. The officers did not find any drugs but did find an envelope containing United States savings bonds with names and addresses that did not match that of the defendant. Id. Another officer looked up the telephone number of one of the persons whose name and address was indicated on the bonds, and after a telephone conversation with the victim, the defendant was arrested. Id. Before the officer made the telephone call, the officers did not know that the bonds were stolen. Previously, the victim had reported the stolen bonds at a police station; none of the searching officers was aware of that report. Id. at 385-386. The court held that the collective knowledge doctrine could not be applied to aggregate the knowledge of the officers because "the police were not aware of the theft reported to station 9 nor were they engaged in a cooperative effort with officers in connection with the stolen bonds who did have this knowledge." Id. at 387.

Where officers are not engaged in a cooperative effort, the court shall not apply the doctrine, thus limiting the danger of

unconstitutional searches and seizures.  Cf. Parsons v. United States, 15 A.3d 276, 279, 281 (D.C. 2011) (trial court applied collective knowledge doctrine improperly); Stearns, supra, Searches Incident to Arrest ("While the 'fellow officer' rule generally works to the advantage of police, it offers no protection when the arresting officer acts at another officer's deficient directions or stale or inaccurate information"). There is no need for the creation of the complex and perplexing new rule that the court chooses to impose here.[6]  The court's refusal in Hawkins to apply the collective knowledge doctrine where officers were not engaged in a cooperative effort

---

[6] It is worth noting that some of the cases relied on by the court do not require such an extensive inquiry into the level of communication between officers acting as a team, or the sufficiency of the acting officer's knowledge of critical facts on his or her own.  See United States v. Ibarra, 493 F.3d 526, 530 (5th Cir. 2007) (requiring only "some degree of communication" between arresting officer and officer who has knowledge of all necessary facts); United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir.), cert. denied, 534 U.S. 982 (2001) (requiring "some degree of communication" to ensure officers functioning as "search team"); State v. Breeding, 200 So. 3d 1193, 1200 (Ala. Crim. App. 2015), quoting United States v. Esle, 743 F.2d 1465, 1476 (11th Cir. 1984) (look to collective knowledge of officers where group of officers conducting operation and "there is at least minimal communication among them").  In Gillette, where one officer obtained consent to search vehicles, and another acting officer responded to a call for backup and immediately started searching the vehicles without knowledge of the consent, the court held that "there was the requisite degree of communication" between the officers to render the acting officer a member of the team, and to uphold the search.  Id. at 1033-1034.

demonstrates that aggregating the knowledge of officers working together complies with art. 14.

For over fifty years, Massachusetts courts consistently have applied this doctrine in a horizontal manner where appropriate. In Commonwealth v. Wooden, 13 Mass. App. Ct. 417, 418 (1982), three police officers -- Saunders, Williams, and Callanan -- were patrolling when the defendant and another man drew their attention. Saunders saw that the other man had something in his hand that he was showing to the defendant. Id. When the men noticed the unmarked cruiser in which the officers were riding, they hurriedly moved down the street. Id. Saunders saw the man drop a manila envelope. Id. Williams saw the defendant had something clenched in his hand and appeared to be putting something in his pocket. Id.

The officers got out of the car, and Saunders opened the manila envelope, finding white powder in several wrapped packages. Wooden, 13 Mass. App. Ct. at 418. Saunders placed both the defendant and the other man under arrest. Id. Searching the defendant after his arrest, Williams found packets of cocaine and marijuana in the defendant's pockets. Id. at 418-419. The court recognized that Saunders personally did not know that the defendant was clenching his hand and putting something into his pockets. Id. at 421 ("[I]f Williams had been acting alone, he could not have arrested either [party] without

knowledge of the contents of the discarded envelope . . . . If [Saunders] act[ed] alone, he could not have arrested the defendant on the sole basis of the contents of the envelope dropped by [the other man]"). Because "Saunders and Williams were working in concert, and they were within an arm's reach of each other as well as the suspects whom they were confronting," the court held that the knowledge of each officer could be imputed to the other. Id. at 421-422, quoting W.R. LaFave, Search and Seizure § 3.5 (c), at 633 (1978) ("They were 'in a close time-space proximity to the questioned arrest [and] search'").

In Commonwealth v. Rivet, 30 Mass. App. Ct. 973, 975 (1991), the Appeals Court rejected an argument made by the defendant that knowledge of the officers should not be aggregated because they did not communicate the known information to one another. Officers Coyle and Dawes both responded to a crash scene, and both determined that there was probable cause to arrest the defendant for operating a motor vehicle while under the influence of intoxicating liquor. Id. at 974. Coyle arrived first and spoke with the defendant, who told him that he had drunk one beer; during their conversation, Coyle noticed that the defendant's eyes were glassy and arrested him. Id. When Dawes arrived, approximately ten to fifteen minutes before the defendant's arrest, he noticed that the

defendant's eyes were bloodshot, there was a heavy odor of alcohol coming from his breath, and he had difficulty speaking. Id. Before Dawes arrived, he had spoken with witnesses who had seen the defendant driving well over the speed limit just before impact. Id. Although the Appeals Court concluded that the information Coyle had on his own supported an inference of intoxication, the knowledge of Coyle and Dawes could be aggregated, recognizing that they "jointly participated in the accident investigation." Id. at 975. "Probable cause to arrest is determined upon an objective view of the facts." Id. Applying the reasoning in Wooden, 13 Mass. App. Ct. at 421-422, the court upheld the arrest. Rivet, supra.[7]

More recently, in Commonwealth v. Roland R., 448 Mass. 278, 285 (2007), the court applied the collective knowledge doctrine to a set of facts highlighting its importance. The juvenile, entering a court house, placed his bag through an X-ray machine and walked through a metal detector. Id. at 280. When he was

_____

[7] It is unclear whether the officers' knowledge in Rivet would be aggregated to meet the probable cause standard under the court's new rule. Were Coyle and Dawes in sufficiently close communications about their objective? What precise information was communicated from one officer to another? Despite the fact that both Coyle and Dawes were on the scene together for at least ten minutes, it is not evident whether their knowledge could be aggregated any longer. See Rivet, 30 Mass. App. Ct. at 974. Not only is this illogical, but it is inconsistent with our objective approach to search and seizure questions.

told by a court officer that his bag would be searched manually, he stated that he did not want his bag searched and grabbed it, turning to leave the building. Id. Officer Martinez, a police officer assigned to the court house on that day, approached the juvenile on the steps of the court house after being told what had occurred. Id. The juvenile then ran from the court house, as Martinez yelled for him to stop and broadcast his description over the radio. Id.

Officer Conway, who was looking out a window on the second floor of the court house, observed Martinez chasing the juvenile. Roland R., 448 Mass. at 280. Conway joined in the chase of the juvenile, along with five to ten other officers, without knowing why the juvenile was being pursued. Id. After several minutes of chasing the juvenile, Conway caught up with him and handcuffed him. Sergeant Detective Terestre, who also was unaware of the reason for the pursuit, gave the juvenile Miranda warnings and asked him why he was running. Id. The juvenile responded that he was running due to the contents of the bag, and on a search of the bag, Terestre found numerous plastic bags of marijuana. Id. The juvenile was arrested. Id.

"[T]he fact that the officers pursuing the juvenile were not personally aware of the circumstances leading to the chase is irrelevant." Roland R., 448 Mass. at 285. "In determining whether police officers have reasonable suspicion for making a

stop, 'the knowledge of each officer is treated as the common knowledge of all officers' and must be examined to determine whether reasonable suspicion exists."  Id., quoting Richardson v. Boston, 53 Mass. App. Ct. 201, 206 (2001).[8]

Roland R. illustrates the value and the practicality of aggregating the knowledge of officers involved in a joint effort.  Frequently, officers must act quickly in an emergency situation.  Where multiple officers are on foot chasing a suspect, they often do not have the luxury of communicating the details of their knowledge leading up to the chase, or "continuously" communicating regarding their shared objective.

---

[8] I respectfully disagree with Justice Wendlandt that Roland R. depicts facts more closely tailored to the vertical collective knowledge doctrine, which, as she deems it, is synonymous with the "fellow officer" rule. Post at    . Contrast Gittens, 211 A.D.2d at 245 ("A number of cases from the Federal courts and other State courts, as well as a leading treatise, have applied the fellow officer rule, which allows, in essence, the imputation of knowledge from one officer to another, to cover any number of officers working together on a joint assignment despite the lack of an express communication of information or direction to take action").  As she implicitly recognizes, there was no verbal command to the acting officers to arrest the defendant. Post at    (acting officer acted on the "non-verbal instruction to assist his fellow officers"). See Roland R., 448 Mass. at 280.  It is true that in Roland R., one officer held the requisite reasonable suspicion on his own. Id. at 284.  It is unclear whether the acting officers were "directed" to stop the juvenile. See id. at 285 (not specifying whether Conway or Terestre heard radio call with description, or whether description included directive to stop juvenile).  Even if Roland R. did not implicate the horizontal collective knowledge doctrine, it illustrates the circumstances that demonstrate its application.

A stop should not be invalidated where there are sufficient facts amounting to reasonable suspicion to stop a suspect simply because the officer who is able to catch him or her was not personally aware of all the information, and where that officer is acting collaboratively with others who do have that information, either in total or in part, but who did not have the time to repeatedly communicate with the acting officer.

Continuing to apply the doctrine, in Commonwealth v. Quinn, 68 Mass. App. Ct. 476, 480 (2007), the Appeals Court imputed the knowledge of one officer to another where they were acting in a cooperative effort to investigate a break-in at a gasoline station in the early hours of the morning. Officers Harvey and Graham were the first to arrive at the gasoline station. Id. at 477. Harvey observed that the front door was "smashed," and Graham radioed that there had been a break-in. Id. Both officers saw two fresh sets of footprints in the snow leading both toward and away from the gasoline station, which led to fresh tire tracks heading toward a nearby highway. Id. Harvey communicated this information over the radio. Id. Officer Donahue, who was advised of the break-in but did not hear the report of fresh tire tracks, drove south on the highway and then doubled back, seeing a car heading away from the gasoline station toward a rotary. Id. at 478. After radioing to the other officers and confirming that no cars passed their

location, he ultimately was able to catch up to the car and stop it.  Id.  Donahue observed shards of glass, a baseball bat covered with shards of glass, and a fresh cut on the driver's hand; he arrested both occupants of the car.  Id.

The Appeals Court imputed the knowledge of Harvey regarding the fresh tire tracks and footprints to Donahue.  Quinn, 68 Mass. App. Ct. at 480.  "The officers were engaged in a cooperative effort to investigate the break-in at the gasoline station, so 'it is unnecessary for the detaining officer to know all the information pertaining to the incident. . . .  [T]he knowledge of one [police officer] . . . [is] the knowledge of all.'"  Id. at 480-481, quoting Commonwealth v. Zirpolo, 37 Mass. App. Ct. 307, 311 (1994).[9]

Additionally, in Montoya, 464 Mass. at 576, the court imputed the knowledge of one officer to another in holding that police had probable cause to arrest the defendant.  Troopers Porter and Saunders were conducting surveillance in the parking lot of a grocery store in separate, unmarked cars.  Id. at 569. Porter saw a pickup truck and sedan parked with the drivers' windows facing each other and the drivers "hanging out of the

---

[9] Again, under the new rule, it is likely that this information would not be aggregated.  Was Donahue's radio communication regarding passing cars enough to constitute "continuous" communication between himself and Harvey and Graham in order to aggregate their knowledge?  The abstract nature of this new rule will make it exceedingly difficult to apply.

windows" and conversing.  Id.  Saunders saw the driver of the sedan pass something to the driver of the truck, and Saunders radioed this information to Porter.  Id.  Porter approached the truck and saw the driver inhaling a substance through a glass tube, and Porter informed Saunders about this observation over the radio.  Id.  Saunders then stopped the sedan and arrested the defendant, who was the driver.  Id.  The court "impute[d] . . . to Saunders the knowledge of the buyer's admission to Porter that he had just purchased the drugs, regardless of whether that admission was immediately communicated by police radio."  Id. at 576, citing Roland R., 448 Mass. at 285.

Beyond the cases discussed supra, there are numerous other Massachusetts opinions in which this court or the Appeals Court either mentioned the collective knowledge doctrine or applied it in a reasonable suspicion or probable cause context, without relying on the content or extent of the communications between the officers involved or the sufficiency of the "critical" facts known to the acting officer.  See Commonwealth v. Gullick, 386 Mass. 278, 283 (1982), S.C., 462 Mass. 1011 (2012) ("Troopers Johnson, Ellis, and Mackin were engaged in a cooperative effort in the investigation of this incident.  We therefore evaluate probable cause on the basis of the collective information of all the officers"); Commonwealth v. Riggins, 366 Mass. 81, 88 (1974) ("Where a cooperative effort is involved, facts within the

knowledge of one police officer have been relied on to justify the conduct of another"); Commonwealth v. Chaisson, 358 Mass. 587, 590 (1971) ("The police were engaged in a cooperative effort in radio-equipped cars.  Hence the knowledge of one officer is imputed to all officers"); Commonwealth v. Dyette, 87 Mass. App. Ct. 548, 555 n.10 (2015) ("The former municipal police officer's knowledge of municipal trespass ordinances may be imputed to his fellow officers"); Commonwealth v. Perez, 80 Mass. App. Ct. 271, 274 (2011) ("The knowledge of one officer is part of 'the collective information' of other officers engaged in the same cooperative effort" [citation omitted]); Commonwealth v. Kotlyarevskiy, 59 Mass. App. Ct. 240, 243 (2003) ("Where, as here, the arresting officers are engaged in a cooperative effort with other officers, probable cause is evaluated on the basis of the collective information of all the officers involved"); Commonwealth v. Peters, 48 Mass. App. Ct. 15, 18 (1999) ("These observations by [one officer], communicated, and even if not, imputed to [the arresting officer], reasonably led the officers to suspect that the defendant had committed a crime" [emphasis added]); Commonwealth v. Mendes, 46 Mass. App. Ct. 581, 589 (1999) ("The officers who arrested the defendant were engaged in a cooperative effort with the officers in the surveillance room on the ninth floor.  We therefore evaluate probable cause on the basis of the collective

information of all the officers"); <u>Zirpolo</u>, 37 Mass. App. Ct. at 311 (applying collective knowledge doctrine in vertical context based on arrest by officer who heard radio communication providing probable cause); <u>Garcia</u>, 34 Mass. App. Ct. at 393 n.8 ("Probable cause can be based upon the collective knowledge of the police officers engaged in a joint effort"); <u>Commonwealth</u> v. <u>Andrews</u>, 34 Mass. App. Ct. 324, 327 (1993) ("collective knowledge of" two officers sufficient to support investigative stop where one officer had detailed description of suspect's shirt and other officer, who did not have that description, stopped defendant); <u>Commonwealth</u> v. <u>Scott</u>, 29 Mass. App. Ct. 1004, 1006 (1990) ("While Officer Surridge's personal knowledge may not have risen to the level of probable cause, other officers present at the scene, also engaged in the effort to apprehend the suspect, possessed additional information. Probable cause may be based on the collective knowledge of police officers when they are engaged in a cooperative effort"); <u>Commonwealth</u> v. <u>Marlborough</u>, 21 Mass. App. Ct. 944, 945 (1985) ("We are not concerned with the completeness of the information possessed by each of the officers who collaborated in the search and arrest. We evaluate probable cause on the basis of the collective information of all the officers"); <u>Commonwealth</u> v. <u>Carrington</u>, 20 Mass. App. Ct. 525, 529 n.4 (1985) ("The Brookline, Newton and Boston officers were engaged in a

cooperative effort in the investigation of this incident. When an arrest is made in the course of such an investigation, the knowledge of one police officer is attributable to all").

Here, the court limits the application of the collective knowledge doctrine in order to prevent officers from making an arrest "without probable cause simply because some other officer, somewhere, has probable cause to arrest." Ante at    , quoting State v. Ochoa, 131 Ariz. 175, 177 (Ariz. Ct. App. 1981). The court's discussion of the concerns of jurisdictions that have required communication of the facts underlying reasonable suspicion and probable cause do not support the new rule enunciated here. See ante at    . The court cites United States v. Massenburg, 654 F.3d 480, 494 (4th Cir. 2011), where the United States Court of Appeals for the Fourth Circuit stated that the absence of a communication requirement could "create an incentive for officers to conduct searches and seizures they believe are likely illegal," merely "in the hopes that uncommunicated information existed." See ante at    . But the court fails to explain how aggregating the knowledge of officers working in a cooperative effort without regard to the extent or content of their communications or the acting officer's precise knowledge of critical facts, which we have done for over one-half century, would encourage this behavior. The court does not point to one case in which we have held that officers acted

dishonestly by trying to pool information after a stop or an arrest.[10]  Going even further, the court discusses concerns of "reward[ing] police officers who were acting in bad faith," pointing to an example of an investigatory team finding "sufficient probable cause or reasonable suspicion based on information that had been learned after the stop."  Ante at    . This would not occur when aggregating the knowledge of the officers involved in a joint effort, because the knowledge of the police at the time of the stop would be aggregated; excluding any information learned after the stop or search.  I find it difficult to logically reach the court's conclusion.

I am mindful that Massachusetts has not adopted the "good faith" exception to the exclusionary rule for purposes of art. 14; instead, we focus on whether violations are "substantial and prejudicial."  Commonwealth v. Hernandez, 456 Mass. 528, 533 (2010).  Nonetheless, the principles underlying the exception illustrate why the new rule, as set out by the court, likely will have little to no deterrent effect.  "The primary purpose

---

[10] In Hawkins, 361 Mass. at 386, the court declined to apply the collective knowledge doctrine because the arresting officers were not engaged in a cooperative effort with those who had knowledge that the recovered bonds were stolen.  Even there, the arresting officers "admitted they had no actual knowledge that the bonds had been stolen until after investigating their ownership," foreclosing the argument that they were acting in "bad faith."  Id.  The court recognized that "[t]he officers here undoubtedly proceeded upon an honest belief that they were acting within the law."  Id. at 387.

of the exclusionary rule is to deter future police misconduct by barring, in a current prosecution, the admission of evidence that the police have obtained in violation of rights protected by the Federal and State Constitutions." Commonwealth v. Santiago, 470 Mass. 574, 578 (2015). "The interest in deterring unlawful police conduct, which is the foundation of the exclusionary rule," is not implicated where an officer's conduct is devoid of wrongdoing. Commonwealth v. Wilkerson, 436 Mass. 137, 142 (2002), quoting United States v. Janis, 428 U.S. 433, 454 (1976) (where "exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted").

The typical officer is acting in good faith, quickly, and in concert with his fellow officers. Requiring the officer to pause to assess the state of his knowledge in such circumstances or to assess the level and content of his communication with his fellow officers is an unrealistic, ineffective, and onerous burden. Moreover, where exclusion has no deterrent effect, "admission of the evidence is unlikely to encourage violations of the Fourth Amendment." Janis, 428 U.S. at 458 n.35. See United States v. Ragsdale, 470 F.2d 24, 31 (5th Cir. 1972) ("Unless we were to presume the unlikely possibility that an officer would be encouraged to conduct an unlawful search on the faint hope that his partner possessed probable cause, no proper

purpose of [the exclusionary] rule would be served by denying to justice the truth which this search disclosed").[11]

Even accepting that the new rule deters some police misconduct, "it is apparent as a matter of logic that there is little if any deterrence when the rule is invoked to suppress evidence obtained by an officer acting in the reasonable belief that his conduct did not violate" constitutional protections. Illinois v. Gates, 462 U.S. 213, 260 (1983) (White, J., concurring).

> "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

United States v. Peltier, 422 U.S. 531, 539 (1975), quoting Michigan v. Tucker, 417 U.S. 433, 447 (1974). See, e.g., Brown

---

[11] Where officers are frequently uninformed of a judge's decision or legal basis for granting a motion to suppress, the "'deterrent safeguard' that is supposed to be provided by . . . review of probable cause is imperfect." LaFave, supra at § 3.1(d), quoting Mapp v. Ohio, 367 U.S. 643 (1961). "Obviously, police cannot be affirmatively influenced to change their methods of law enforcement by the exclusion of evidence when there is no communication to them of why the decision was made." LaFave, supra, quoting LaFave & Remington, Controlling the Police: The Judge's Role in Making and Reviewing Law Enforcement Decisions, 63 Mich. L. Rev. 987, 1005 (1965). The prosecutor is in the best position to communicate this to an officer.

v. <u>Illinois</u>, 422 U.S. 590, 610 (1975) (Powell, J., concurring) ("police normally will not make an illegal arrest in the hope of eventually obtaining such a truly volunteered statement"). Maintaining the collective knowledge doctrine as we have historically applied it will not encourage officers to act without the requisite suspicion, where, as here, the acting officer reasonably believes that he has sufficient information to stop a suspect. For these reasons, the court is incorrect that my approach would invite "post hoc rationalizations." <u>Ante</u> at .

The court's decision today overturns years of consistent and settled case law within Massachusetts. Contrast <u>Commonwealth</u> v. <u>Rossetti</u>, 489 Mass. 589, 609 (2022) ("Where our . . . jurisprudence does not currently reveal any settled or consistent legal principles surrounding [the issue], we view our decision today as departing only minimally from the principle of stare decisis"). Because I think our steadfast application of the collective knowledge doctrine to officers engaged in a collaborative investigation is consistent with the protections of art. 14, I would not do so.

Putting aside my agreement with the court that there was reasonable suspicion to stop the defendant without resorting to the collective knowledge doctrine, applying the doctrine as it has been applied historically, Lieutenant (then Sergeant) Daryl

Dwan's and Officer Luis Lopez's knowledge and observations would be imputed to Doherty. All three officers were working as part of a joint effort to apprehend the perpetrator of the armed robbery that had occurred minutes prior. Doherty was listening to the department radio channel, the same station on which the description including the beard was broadcast, on which he heard Dwan's updates about his observations on Morrissey Boulevard. After hearing that, Doherty decided to canvas the Clam Point area to search for the suspect. As soon as details of the armed robbery were broadcast via the radio channel, Dwan began canvassing Morrissey Boulevard. When Lopez heard the broadcast reporting the armed robbery, he began driving around the area of Victory Road, which he believed to be a potential flight path of the suspect. Eventually, Dwan noticed the defendant, and approached him at the same time as Doherty. Dwan described the seizure and search of the defendant's backpack as a "joint endeavor."

As the court concedes, ante at    , the three officers were engaged in a joint effort, sparked by communications on the department radio channel, to discover the suspect. Thus, "'the knowledge of each officer is treated as the common knowledge of all officers' and must be examined to determine whether reasonable suspicion exists." Roland R., 448 Mass. at 285, quoting Richardson, 53 Mass. App. Ct. at 206. Applying the

collective knowledge doctrine as it should be applied, in my view, further bolsters reasonable suspicion.

Inserting a requirement that the officers be in "close and continuous" communications with each other about a joint objective and that the acting officer must have knowledge of at least some of the critical facts eviscerates the horizontal collective knowledge doctrine as it has been applied by Massachusetts courts for over one-half century and replaces it with a convoluted test that is problematic in its application. Because I think that our jurisprudence regarding the collective knowledge doctrine is supported by the general objectivity with which we approach search and seizure law under art. 14, and by practical considerations, I would not upend it.

I concur with the court's finding of reasonable suspicion, but I respectfully dissent from the decision of the court regarding the retreat from the collective knowledge doctrine.

WENDLANDT, J. (concurring).  We are called in this case, as the United States Supreme Court was called in Terry v. Ohio, 392 U.S. 1, 4 (1968), to address "serious questions concerning the role of the Fourth Amendment [to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights] in the confrontation on the street between a[n individual] and the police[ officer] investigating suspicious circumstances."  In Terry, the Court carved "a narrowly drawn authority" to permit an officer to conduct a limited stop and patfrisk of an individual based on reasonable suspicion -- a showing less than that required to establish probable cause for a warrant.  Id. at 27.  This strictly circumscribed permission was designed to give the officer on the scene "an escalating set of flexible responses, graduated in relation to the amount of information" possessed by the officer, during the "rapidly unfolding and often dangerous situations" the officer faces, especially in the nation's cities.  Id. at 10.

In detailing this narrow ground for a stop, the Court emphatically rejected the notion that the stop did not implicate core constitutional concerns; "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" in a constitutional sense.  Id. at 16.  A stop and subsequent patfrisk of an individual "is a serious intrusion upon the

sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." Id. at 17. Nonetheless, the Court recognized the need to provide a level of flexibility to police activities, which entail "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat" (emphasis added). Id. at 20.

Balancing the nature of the invasion and the needs of law enforcement officers to act upon the information they are receiving in real time, the Court set forth the following objective test to permit a warrantless stop: whether "the facts available to the officer at the moment of the seizure . . . [would] 'warrant a [person] of reasonable caution in the belief'" that a crime had been, was being, or was about to be committed (emphasis added). Id. at 21-22. In defining the reasonable suspicion test, the Court noted that "[a]nything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches" (emphasis added); and it remarked that a test based on good faith alone would subject the people to the discretion of the police, largely causing the constitutional protections to "evaporate." Id. at 22. The genesis of this narrow police authorization and the balance upon which it rests counsel that

we reject the so-called horizontal collective knowledge doctrine in all its varied forms.

The court today charts a different path, and there is some good news and some bad. First, the good news: the court rejects what it terms the "minority view" of the "horizontal collective knowledge doctrine." Ante at     . Under this legal regime, the officer on the beat who detains you, pats you down, and invades your personal autonomy by sliding hands up, down and across your body in an ostensible search for weapons is not considered to be acting as an individual human being. Instead, the officer is part of "the" police -- a conceptual collective "organism" apparently composed of a database of inculpatory information about which the individual officer is entirely ignorant at the time he or she stops and frisks you. The officer's conduct is justified if somewhere in the dark recesses of "the" police databank there exists information that can be cobbled together post hoc to form the bare minimal showing required for reasonable suspicion. The court rightly rejects this police encounter of the third kind, and that is good news.

Now, the bad news: the court adopts what it terms the "second approach" of the "horizontal collective knowledge" doctrine. Ante at     . Under this new order, the individual officer is not part of a faceless, amorphous collective. Instead, he or she is part of a "team" -- a finite set of

officers "in close and continuous communication" with a "shared objective." <u>Ante</u> at    .  The court adopts this version of the horizontal collective knowledge doctrine, reasoning that, despite all the advances in communications and surveillance technology since <u>Terry</u> was decided, officers who are working as a team on a shared mission and who are in constant contact apparently can communicate "critical" facts but cannot be expected to communicate the minimal information required for reasonable suspicion.  The stop and patfrisk are justified after the fact if the facts constituting reasonable suspicion, while uncommunicated, were known to one or more of the officers on the team -- in short, an officer on the beat can detain and pat frisk you based on a hunch, in the hopes that afterward fellow officers can fill in the missing gaps in the reasonable suspicion calculus.

In assessing the merits of the court's approach, it is important to remember that reasonable suspicion is, by design, not a high hurdle; it is something less than probable cause.  It can be based on information as to which the acting officer has personal knowledge -- information based on the officer's own observations gathered through the use of his or her own senses.  It can also be grounded in information acquired from third parties or other sources of reliable information, whether from 911 calls, police dispatchers, police bulletins, confidential

informants, or fellow officers.  And the acting officer may draw reasonable inferences and pull on his or her years of experience in assessing the evolving situation.

Holding a law enforcement officer to this bare minimal standard even when he or she is working jointly with others before permitting the officer to intrude on the sanctity of the person does not ignore, as the court surmises, the "practical reality of effective law enforcement." Ante at    .  Indeed, it was the recognition of the realities of fast-paced, on the street encounters that was the genesis of the reasonable suspicion standard -- a standard that represents the Court's careful calibration between the nature of the invasion of the rights of the individual, on the one hand, and the undeniable needs of law enforcement to urgently respond to suspected criminal activity and potentially dangerous situations, on the other.  The Court in Terry set a constitutional floor -- a baseline that we certainly should not (and in my view cannot) abandon under the auspices of art. 14 of our State Constitution.

1.  Fellow officer rule.  Notably, this case does not concern the fellow officer rule, what the court terms the "vertical" collective knowledge doctrine.  Under this rule, the acting officer may assist a fellow officer by executing a Terry-type stop in reliance that the directing officer had a constitutional basis for the stop; in such a case, whether the

stop passes constitutional muster will depend on whether the directing officer had the information constituting reasonable suspicion.  See United States v. Hensley, 469 U.S. 221, 231 (1985), quoting United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir. 1976) ("effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and . . . officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information"); Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971) ("police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause").

The fellow officer rule is "a matter of common sense:  the rule minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions or officers and enables police to act promptly in reliance on information from another jurisdiction or officer" (alterations omitted).  United States v. Massenburg, 654 F.3d 480, 494 (4th Cir. 2011), quoting Hensley, 469 U.S. at 231.  Thus, the fellow officer rule "simply directs us to substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer."

Massenburg, supra at 493.  See 2 W.R. LaFave, Search and Seizure § 3.5(b), at 333 (6th ed. 2020) ("Thus, under the Whiteley rule [or, as it is sometimes termed, the 'fellow officer' rule] police are in a limited sense 'entitled to act' upon the strength of a communication through official channels directing or requesting than an arrest or search be made" [citations omitted]).[1]

2.  Horizontal collective knowledge doctrine.  Unlike the fellow officer rule, which is a commonsense response to the oftentimes quickly unfolding events officers encounter and allows the acting officer to rely on the verbal (or nonverbal, see note 1, supra) directions relayed by fellow officers, the horizontal collective knowledge doctrine is anathema to the Fourth Amendment and art. 14.  Even under the version of the "second approach" to the horizontal collective knowledge doctrine adopted by the court, it permits an officer to stop (and presumably pat frisk) an individual without beforehand

_____

[1] In Commonwealth v. Roland R., 448 Mass. 278, 280 (2007), for example, the acting officer stopped the juvenile after seeing fellow officers chasing him at the direction of an instructing officer, who had the requisite information constituting reasonable suspicion.  Although the court stated that its conclusion rested on the horizontal collective knowledge doctrine, id. at 285, the facts fall within the fellow officer rule -- namely, that the acting officer acted upon seeing the chase, a nonverbal instruction to assist his fellow officers, who were chasing the juvenile at the order of the directing officer who, in turn, had the requisite reasonable suspicion.  Id. at 280.

having information constituting reasonable suspicion and without any commonsense reliance on a fellow officer's directions; shockingly, it invites a judge to be complicit in the unraveling of this fundamental constitutional right.  See Terry, 392 U.S. at 9, quoting Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law").

The doctrine rests on the hope that, post hoc, a judge will cobble together information known to other officers on the team -- information as to which the acting officer is entirely ignorant and has no basis to believe is known to a fellow officer -- to constitute the minimal requirement of reasonable suspicion for the stop.  It is divorced entirely from the urgency that birthed the limited nature of the Terry-type stop and frisk -- namely, that the officer at the scene, the one facing the exigencies attendant thereto, needs to be able to rely on the rapidly unfolding information known to him or her as well as the "reasonable inferences which [the officer] is entitled to draw from the facts in light of his [or her] experience."  Terry, 392 U.S. at 27.  And it jettisons the careful balance struck by the Court in defining the reasonable

suspicion standard, between the right to be free from governmental restraint and the attendant serious intrusion on the sanctity of the person, on the one hand, and the needs of the law enforcement officer on the street to be able to quickly react to the information being received and to draw reasonable inferences from that information consistent with his or her experience, on the other.  Id. at 21-22.

The few cases that provide a rationale for adopting the horizontal collective knowledge doctrine sacrifice this careful balance apparently on the same assumption driving the court's decision today -- namely, that officers working as a team in close and continuous communication can communicate some "critical facts," but cannot be expected communicate the minimal information constituting reasonable suspicion during the course of the fast-paced, dynamically evolving events on the ground. See, e.g., United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002) ("Investigative stops generally occur in a dynamic environment marked by the potential for violence.  Officers who jointly make such stops rarely will have an opportunity to confer during the course of the stop").  Contrary to this distorted view of the balance struck by the Supreme Court in Terry, adherence to the reasonable suspicion standard would not require officers in hot pursuit of a suspect to "stop and confer" or to convene a "conference" while permitting the

suspect to flee.  Ante at    .  Obviously, officers could employ any and all methods of communication, including, for example, those used to relay the "critical facts" constituting those minimally required to rise to the level of reasonable suspicion. But if the acting officer lacks information required for reasonable suspicion, the officer's conduct falls below the Supreme Court's carefully constructed constitutional floor -- it is unguided by any constitutional norms.  See United States v. Ross, 456 U.S. 798, 824-825 (1982), quoting Mincey v. Arizona, 437 U.S. 385, 390 (1978) ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions").

Perversely, because the acting officer is totally ignorant as to whether information constituting reasonable suspicion exists, the horizontal collective knowledge doctrine provides incentive to the acting officer to roll the dice and stop an individual knowing that reasonable suspicion is absent, on the off chance that other information unbeknownst to him or her might supply the gaps missing in the reasonable suspicion calculus.  See Massenburg, 654 F.3d at 494 (horizontal collective knowledge doctrine "would only create an incentive for officers to conduct search and seizures they believe are

likely illegal," which is "directly contrary to the purposes of longstanding Fourth Amendment jurisprudence").  In short, the doctrine represents the feared "[a]nything less," which the Supreme Court rightly predicted "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches."  Terry, 392 U.S. at 22.

Like the United States Courts of Appeals for the Second, Fourth, and Tenth Circuits, I can find nothing to commend the doctrine and accordingly reject it.  See Massenburg, 654 F.3d at 494-495 ("Though we have studied our sister circuits' cases adopting an aggregation rule, we can find no convincing defense of it. . . .  Because we believe the aggregation rule runs contrary to the Supreme Court's Fourth Amendment jurisprudence, would seriously erode the efficacy of the exclusionary rule's deterrent purposes, and serves none of the legitimate ends of law enforcement, we reject it").  See also United States v. Hussain, 835 F.3d 307, 316 n.8 (2d Cir. 2016) ("Absent record evidence that [the first officer] communicated his suspicion or any relevant information to [the acting officer] before the latter began to conduct the protective search, we will not impute his knowledge or reasonable suspicion to [the acting officer] under the doctrine of collective knowledge. . . .  [W]e decline to extend the collective knowledge doctrine to cases where, as here, there is no evidence that an officer has

communicated his suspicions with the officer conducting the search, even when the officers are working closely together at a scene"); United States v. Whitley, 680 F.3d 1227, 1234 n.3 (10th Cir. 2012), quoting United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008), cert. denied, 555 U.S. 1121 (2009) (confirming requirement that individual officers "have communicated the information they possess individually" to arresting officer ex ante); United States v. Shareef, 100 F.3d 1491, 1503-1505 (10th Cir. 1996) (no constitutional basis for arrest where officers did not actually communicate information constituting probable cause to one another, either verbally or nonverbally, ex ante).

To be sure, like the court here, ante at    , two of these Federal courts -- the Second and Tenth Circuits -- themselves use the "collective knowledge" language such as "imputed" or "aggregated" information in describing their approach; it is an unfortunate misuse of the terminology.  Instead, the courts in these jurisdictions conclude that the acting officer may rely on information communicated to him or her by other officers or sources and that he or she need not have personally observed the information; but the acting officer must have had this information, whether from his or her direct observations or from what had been communicated to him or her, ex ante, before the stop and patfrisk were initiated.  See Hussain, 835 F.3d at 316 n.8; Chavez, 534 F.3d at 1345.

In other words, the rules of evidence, which generally limit a witness to testifying to information as to which he or she has personal knowledge, and which traditionally govern admissibility of evidence in our court rooms, do not limit the scope of the information an officer on the beat may rely upon in assessing the rapidly unfolding situation he or she encounters on the street.  See, e.g., Commonwealth v. Manha, 479 Mass. 44, 47-48 (2018) (reasonable suspicion to conduct Terry-type stop and patfrisk based on reliable information from anonymous 911 caller but as to which acting officer lacked personal knowledge); Commonwealth v. Mercado, 422 Mass. 367, 369 (1996) (reasonable suspicion to conduct Terry-type stop based, in part, on information conveyed in radio bulletin and by witness but as to which officer lacked personal knowledge).  See also United States v. Blair, 524 F.3d 740, 751 (6th Cir. 2008) (noting "unremarkable proposition that one officer may conduct a Terry[-type] stop based on the information obtained from another officer").  Because those evidentiary rules do not govern the reasonable suspicion analysis, I see no need to adopt any version of the horizontal collective knowledge doctrine on the basis of their application.  See Terry, 392 U.S. at 21-22 (officer may rely on facts sufficient to "warrant a man of reasonable caution in the belief" that crime had been, was being, or was about to be committed).

Indeed, the Cartesian terminology, in my view, is entirely unhelpful and has led to widespread confusion.  See ante at    (describing "vertical" collective knowledge doctrine; "first approach" to horizontal collective knowledge doctrine requiring ex ante communication of facts constituting reasonable suspicion to acting officer; exception to first approach; "second approach" to horizontal collective knowledge doctrine; "minority view" of horizontal collective knowledge doctrine; and numerous other variations thereof).

The rule should be, and under Terry must be, this:  one officer, whether it is the officer who directs the acting officer to stop the suspect (i.e., the fellow officer rule, see discussion and note 1, supra) or the acting officer him- or herself, must have the information constituting reasonable suspicion -- whether it is information as to which the officer has personal knowledge or information he or she has been told -- before the stop and patfrisk are conducted.  This is the constitutional balance struck by Terry and its progeny between the rights of the individual to be free from unreasonable searches and seizures and the need to accommodate the law enforcement realities of the quickly unfolding events on the ground.

Laudably, the court rejects the more extreme version of the horizontal collective knowledge doctrine, which treats the

police as an "organism" with unfettered access to a database of inculpatory information that can be accessed post hoc to justify an otherwise unconstitutional stop and patfrisk. See Shareef, 100 F.3d at 1504 & n.6. The court today cabins its version of the horizontal collective knowledge doctrine, concluding that it applies only in situations where officers are involved in a joint investigation with a mutual purpose and objective and in close and continuous communication with each other about that objective, and the acting officer has knowledge "of at least some of the critical facts." Ante at    . But the court does not explain why an officer who knows the "critical" facts cannot be expected to know the facts constituting reasonable suspicion, which itself is a low bar. See generally 4 LaFave, supra at § 9.5(b) at 672-691 (comparing reasonable suspicion and probable cause). Although to a lesser extent than the unbridled adoption of the "minority view" of the horizontal collective knowledge doctrine might be, the adopted approach is the proverbial camel's nose under the tent. It threatens individuals with unconstitutional intrusions on their persons, inflicting great indignity and arousing strong resentment, all the while requiring judges to condone this behavior in connection with their hindsight review.

3. Inevitable discovery exception. The court adopts its version of the horizontal collective knowledge doctrine

apparently out of the concern that rejecting the horizontal collective knowledge doctrine would "make[] little sense from a practical standpoint" because it would "[b]as[e] the legitimacy of the stop solely on what the officer who first approaches the suspect knows." Ante at    , quoting Cook, 277 F.3d at 86. However, if the first officer acts too swiftly but a second officer has reasonable suspicion, our existing inevitable discovery doctrine permits the use of the evidence at trial as an exception to the exclusionary rule. See United States v. Ragsdale, 470 F.2d 24, 30 (5th Cir. 1972) (exclusionary rule does not apply when search "would imminently and lawfully have been made and [the evidence would have been] discovered at this very time and place and by this team of officers" if acting officer had waited); United States v. Gorham, 317 F. Supp. 3d 459, 474 (D.D.C. 2018), quoting 2 W.R. LaFave, Search and Seizure § 3.5(c) (5th ed. Supp. Oct. 2017) ("Unlike in the typical 'horizontal' collective knowledge case, Ragsdale does not require a post hoc aggregation of information among officers; rather, an officer with all the required information was present and 'it is clear the search would imminently and lawfully have been made'").

Under this long-standing doctrine:

"if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police,

> there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings. In that situation, the State has gained no advantage at trial and the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a <u>worse</u> position than it would have occupied without any police misconduct."

<u>Nix</u> v. <u>Williams</u>, 467 U.S. 431, 447 (1984). See <u>id</u>. at 448-449 (declining to apply exclusionary rule when "volunteer search party would ultimately or inevitably have discovered the victim's body"). The doctrine provides that evidence that would otherwise have been excluded is admissible nonetheless if the Commonwealth demonstrates by a preponderance of the evidence "that discovery of the evidence by lawful means was certain as a practical matter, 'the officers did not act in bad faith to accelerate the discovery of evidence, and the particular constitutional violation is not so severe as to require suppression.'" <u>Commonwealth</u> v. <u>Hernandez</u>, 473 Mass. 379, 386 (2015), quoting <u>Commonwealth</u> v. <u>Sbordone</u>, 424 Mass. 802, 810 (1997) (no exclusion of handgun found in course of unlawful search of trunk because there would have been reasonable suspicion after subsequent showup identification). Thus, our long-standing jurisprudence based on the inevitable discovery doctrine provides a commonsense approach to assuage the fear

undergirding the court's adoption of its version of the horizontal collective knowledge doctrine.[2]

4. Reasonable suspicion. Despite the foregoing, I concur in the judgment because Officer Brian Doherty had the requisite reasonable suspicion; I do so, however, without imputing any of Lieutenant (then Sergeant) Daryl Dwan's uncommunicated information. In other words, Doherty, even without the information concerning the suspect's facial hair, had reasonable suspicion to stop the defendant.

Briefly, at the time Doherty stopped the defendant, he knew that an armed robbery had been committed a little after 3:30 A.M. The grave nature of the crime and the imminent danger presented by the suspect on the loose in the neighborhood properly may be considered in the reasonable suspicion calculus. See Commonwealth v. Henley, 488 Mass. 95, 104 (2021), quoting Commonwealth v. Depina, 456 Mass. 238, 247 (2010) ("The gravity of the crime and the present danger of the circumstances may be considered in the reasonable suspicion calculus"); Commonwealth

---

[2] Of course, as the court notes, ante at    , the inevitable discovery doctrine may not apply where a second officer both has been unable to communicate information to the acting officer and is not at the scene of the stop and patfrisk. In such a scenario, the acting officer lacks reasonable suspicion; we ought not permit him or her to get by the meager constitutional hurdle -- the one set by the Supreme Court in Terry as the constitutionally mandated minimal standard -- with a little help from his or her silent and distant friends.

v. Evelyn, 485 Mass. 691, 705 (2020) ("circumstances indicated a potential ongoing risk to public safety and therefore weighed in favor of reasonable suspicion").

Doherty also had, at a minimum, heard the first transmitted description of the suspect of the armed robbery as a Black man in his late twenties, who was between five foot seven and five foot eight, wearing jeans, and walking toward a pharmacy, and then had seen that the defendant largely matched this description. See Commonwealth v. Meneus, 476 Mass. 231, 236 (2017), quoting Commonwealth v. Lopes, 455 Mass. 147, 158 (2009) ("We have no hard and fast rule governing the required level of particularity of a description; our constitutional analysis ultimately is practical, balancing the risk that an innocent person will be needlessly stopped with the risk that a guilty person will be allowed to escape" [alterations omitted]).

Doherty also saw the defendant in close temporal and geographic proximity to the scene of the armed robbery, which had occurred just seven minutes prior to him encountering the defendant. See Commonwealth v. Warren, 475 Mass. 530, 536 (2016) ("proximity of the stop to the time and location of the crime is a relevant factor in the reasonable suspicion analysis").

It was dark and raining, and Doherty did not see anyone else in the area surrounding the crime scene as he canvassed

various streets in the area for approximately four to six minutes following the report of the crime. He was aware of Dwan's report that Dwan was on Morrisey Boulevard and also had not seen anyone. Thus, not only did the defendant fit the general description of the suspect, but the defendant was the only person near the scene of the crime within seven minutes of its occurrence. See Evelyn, 485 Mass. at 704-705 (reasonable suspicion without any description when "officers encountered the defendant thirteen minutes after the shooting, one-half mile distant from it" on "a cold night, and the officers had not seen any other pedestrians on the nearby streets"). Compare Warren, 475 Mass. at 536 (no reasonable suspicion based on general description for defendant found twenty-five minutes later, approximately one mile from scene of crime), with Henley, 488 Mass. at 104 (reasonable suspicion based on general description for defendant found five minutes later, two blocks from scene of crime), and Depina, 456 Mass. at 246 (reasonable suspicion based on general description when defendant, "approximately ten minutes after the report of the shooting, was seen within three blocks of the crime scene, and he was moving away from the area of the shooting"). See also Warren, supra, citing Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 555 n.8 (2002) ("Proximity is accorded greater probative value in the reasonable suspicion calculus when the distance is short and the timing is close").

Finally, Doherty knew that the defendant was in the reported flight path of the suspect and that that path included a hole in the fence between the crime scene and the location where he found the defendant.  See Warren, 457 Mass. at 536-538, citing Commonwealth v. Foster, 48 Mass. App. Ct. 671, 672-673, 676 (2000) (whether defendant is found in direction of flight path relevant to reasonable suspicion).

Considering the totality of the circumstances,[3] it was reasonable for Doherty to stop the defendant.  Accordingly, I concur in the judgment.

---

[3] Even if no one factor results in the necessary individualized suspicion, considered in combination, several factors "may allow the police to narrow the range of suspects to [a] particular individual[]."  Mercado, 422 Mass. at 371.  See id. (circumstances giving rise to reasonable suspicion must be such as to "distinguish [the defendant] from other persons in the vicinity").